710 A.2d 167 (1998)
RHODE ISLAND DEPOSITORS ECONOMIC PROTECTION CORPORATION
v.
MAPLEROOT DEVELOPMENT CORPORATION et al.
No. 97-3-M.P.
Supreme Court of Rhode Island.
April 9, 1998.
*168 William M. Dolan, III, Jeffrey C. Schreck, Providence, for Plaintiff.
David A. Wollin, Anthony F. Muri, Providence, for Defendant.
Before WEISBERGER, C.J., and LEDERBERG, FLANDERS and GOLDBERG, JJ.
OPINION
FLANDERS, Justice.
When the Rhode Island Depositors Economic Protection Corporation (DEPCO) has acquired a loan from an insolvent lender's receiver and is suing the borrowers to collect on the defaulted loan, can DEPCO invoke the attorney-client privilege to prevent the borrowers from obtaining discovery of certain loan-related legal advice provided to the lender and/or to its receiver by their respective attorneys? Because we conclude that the General Assembly intended DEPCO to have all the privileges and powers necessary and convenient to accomplish its purposes and for the courts to construe DEPCO's enabling legislation liberally in favor of DEPCO's purposes, we answer this question in the affirmative.
We have been petitioned by DEPCO to quash a Superior Court discovery order. The order compels DEPCO to disclose certain documents in its possession to borrowers who are allegedly in default of a $1.55 million loan. DEPCO acquired this loan when it purchased substantially all the assets of the now-defunct Marquette Credit Union (Marquette) from Marquette's receiver.[1] The documents supposedly contain attorney-client communications pertaining to this loan. More particularly, the documents in question relate to communications between (1) Marquette and its legal counsel and (2) Marquette's receiver and the receiver's legal counsel relative to the loan and its collection. The respondents, Mapleroot Development Corporation and its shareholders (collectively Mapleroot), sought production of these documents in connection with their defense of a lawsuit brought against them by DEPCO seeking to obtain repayment of the loan. They claim that DEPCO lacks standing to assert an attorney-client privilege that belonged to Marquette or to its receiver. They further assert that DEPCO had no authority to acquire such a privilege when it purchased from Marquette's receiver substantially all of Marquette's assets, including the loan at issue in this litigation.
After a Superior Court justice compelled DEPCO to produce the requested attorney-client documents to Mapleroot, we issued a writ of certiorari to review this ruling. For the reasons set forth below, we now grant the petition and quash the discovery order.
Analysis
The Rhode Island Depositors Economic Protection Act of 1991, P.L.1991, ch. 3, § 4, codified at G.L.1956 § 42-116-1 (the act), was "a comprehensive plan enacted to deal with an overwhelming economic and human crisis" stemming from the "failure of the Rhode Island Share and Deposit Indemnity Corporation (RISDIC) and the subsequent banking crisis." In re Advisory Opinion to the Governor (DEPCO), 593 A.2d 943, 946 (R.I.1991) (upholding the act against various constitutional challenges); see also Rhode Island DEPCO v. Brown, 659 A.2d 95, 98-99 (R.I.1995) (rejecting further constitutional challenges), cert. denied, sub nom. Ernst & Young v. Rhode Island DEPCO, 516 U.S. *169 975, 116 S.Ct. 476, 133 L.Ed.2d 405 (1995). The heart of this comprehensive plan was the establishment of an independent public corporate entity known as DEPCO to "carry out the provisions of the act:
"There is hereby created a public corporation of the state, having a distinct legal existence from the state and not' constituting a department of the state government, with such politic and corporate powers as set forth in this chapter, to be known as [DEPCO], to carry out the provisions of this chapter." Section 42-116-4(a).
In the wake of the Rhode Island's banking and credit union crisis in the early 1990s,[2] the General Assembly created DEPCO for the purpose of "providing stability for financial institutions, promoting the welfare of the people of the state, and improving the economic welfare of the people of the state." Section 42-116-2(d). The legislative findings spell out DEPCO's mission with particular detail:
"The purpose of this chapter is to establish [DEPCO], with the power and authority to acquire all or a portion of the assets of the financial institutions upon such terms and conditions as the corporation shall deem advisable the consideration for which may include payment to the depositors of the institutions of certain amounts in respect of their deposit liabilities, which acquisition is intended to aid the prompt payment of the deposit liabilities of the financial institutions to each depositor to the extent and in the manner as the corporation shall determine. In carrying out its purpose, the corporation shall seek to: (i) Maximize the return from the sale or other disposition of the assets of the corporation * * *." Section 42-116-2(e).
To allow DEPCO to carry out its purposes, the Legislature fortified DEPCO with an arsenal of enumerated powers, together with all the powers of a business corporation organized under the Rhode Island Business Corporations Act, G.L.1956 § 7-1.1-4. The powers expressly granted to DEPCO include the power to "acquire or purchase all or any portion of the assets of one or more eligible institutions, and to hold such assets in such manner as the corporation shall deem advisable and sell or dispose of such assets * * *." Section 42-116-6(a).
In particular, the General Assembly invested DEPCO with all "powers, authority, rights, privileges, and titles" necessary to enable it to accomplish its purposes (§ 42-116-4(a)); the power and authority to acquire assets on terms and conditions it deemed to be advisable (§ 42-116-2(e)); the right to acquire, own, and exercise all manner of intangible-property rights (§ 42-116-5(p)); the right to exercise the general powers of a corporation (§ 42-116-5(q)); and the right to act as a receiver (§ 42-116-6(k)). Finally, the General Assembly also gave DEPCO "all powers to do all things necessary and convenient to carry out and effectuate the purposes and provisions of this chapter." Section 42-116-5. (Emphasis added.)
In this case the receiver filed an application in Superior Court for authority to enter into an asset-purchase agreement with DEPCO. In accordance with the terms of a written offer (the offer) from DEPCO to acquire such assets, the receiver proposed to sell to DEPCO certain loans of Marquette and other financial institutions, including the loan at issue in this case. The Superior Court entered a final order approving this application pursuant to the terms of the offer.
As a result DEPCO purchased "all of the Receiver's rights, title and interest in and to all of [Marquette's] assets, properties and rights of any kind, whether real or personal, tangible or intangible * * *." (Emphases added.) Further, paragraph 2(b) of the offer provided that "the term Assets specifically includes all causes of action and claims of any kind of [Marquette] or the Receiver * * *." Most importantly the offer explicitly provided for the transfer of all of Marquette's and the receiver's privileges to DEPCO: .
"DEPCO for itself and its successors or assigns, shall acquire the benefit of all rights, privileges, remedies, defenses, *170 rights of recoupment or set-off, claim and counterclaim of [Marquette] or the Receiver under common law, equity or any statute * * * [and] all other rights, privileges, remedies, defenses, claims and counterclaims available to [Marquette] or the Receiver with respect to Assets, the Assumed Deposit Liabilities or the Retained Deposits under any contract, statute or at law or equity * * *"" (Emphases added.)
In our judgment DEPCO's broad powers and rights as set forth in its enabling legislation are expansive enough to include DEPCO's asserted power to acquire and exercise privileges formerly belonging to an entity like Marquette, including the power to assert the attorney-client privilege vis-a-vis any acquired loan assets. Moreover, the General Assembly's inclusion of a liberal interpretation clause in DEPCO's enabling legislation also militates in favor of permitting it to acquire whatever privileges may have formerly belonged to the acquired entity. See § 42-116-4(a) ("[t]his chapter shall be liberally construed in conformity with the purpose expressed").
We are of the opinion that for DEPCO to maximize the return to the depositors of failed credit unions like Marquette, it would be necessary and convenient for DEPCO to be able to acquire and exercise the attorney-client privilege that formerly belonged to the now-insolvent lender whose loans DEPCO has acquired. Indeed its ability to acquire all or selected portions of the loan portfolios of these failed institutions on terms and conditions it deems advisable and to enforce any promissory notes associated therewith against their obligors may depend in varying degrees on its being able to take full advantage of whatever legal advice or strategy may have been previously given to the lender concerning such loans. We are also convinced that the value of the loans acquired by DEPCO could be adversely affected if its ability to obtain repayment from defaulting borrowers was capable of being impeded or thwarted by the borrower's ability to obtain through discovery whatever confidential attorney-client communications may have been exchanged between the failed lender (and/or its receiver) and its attorneys. Such communications could include frank assessments of the strengths and weaknesses of the loan documentation prepared by the lending institution's attorneys and communicated to its officers in the expectation that such confidences and legal counseling would not be subject to disclosure in later litigation. They could also include foreclosure advice, litigation strategy, and other attorney work-product related thereto. Such advice might contain admissions or reveal other legal weaknesses in the loan documentation, in the course of the dealings between the parties to the loan, or in the lender's collection activity that might prove detrimental to DEPCO's litigation efforts if such confidential attorney-client communications were discoverable by the borrowers or their trial attorneys.
If DEPCO had acquired these same Marquette loans as a conservator or a receiver, as it is authorized to do under § 42-116-6(k), we believe that DEPCO would have been entitled to assert the attorney-client privilege with respect to any eligible documents it received when Marquette transferred its loan portfolios. Cf. Commodity Futures Trading Commission v. Weintraub, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) (a bankruptcy trustee for a corporation, and by extension a corporate receiver, is authorized as a matter of law to assert or to waive the privilege with respect to the corporation's prebankruptcy attorney-client communications). Although it was not purporting to act as a receiver when it purchased the loan at issue here, DEPCO expressly purchased all of the receiver's personal and intangible rights with respect to this borrower. Such rights would include the receiver's right to assert any attorney-client privilege that formerly belonged to Marquette. Accordingly we can conceive of no reason why DEPCO, as the purchaser of substantially all the assets of a failed credit union, should not also be allowed to purchase and to assert the same attorney-client privilege that it could invoke as a receiver when it is "necessary and convenient" to the accomplishment of its statutory mission for it to do so. Such a construction, we believe, is useful to DEPCO as well as necessary in order for it to accomplish its purposes, including its attempts to collect on the defaulted loans for the benefit *171 of the depositors and for the economic welfare of the public at large.
The parties have referred at length in their briefs and arguments to various federal cases construing analogous federal legislation.[3] However, we conclude that in the main these cases are inapposite to the issue we face. The language employed by the General Assembly in DEPCO's enabling legislation is sufficiently dissimilar in certain respects to its federal counterparts to dispel any notion that we should simply engraft wholesale upon this state's act the sometimes conflicting federal case law construing the powers of the Federal Deposit Insurance Corporation (FDIC) under the FDIC act and the 1989 Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) statutes. Compare, e.g., 12 U. S. C. § 1821(d)(2), § 1823(d)(3) (FDIC/corporation "shall * * * succeed to * * * all rights, titles, powers, and privileges of the insured depository institution") `with G.L.1956 § 42-116-5 ("[t]he corporation shall have all powers to do all things necessary and convenient to carry out and effectuate the purposes and provisions of this chapter").
Finally, Mapleroot contends that DEPCO should not be allowed to acquire an evidentiary privilege from Marquette's receiver because the General Assembly failed to designate this right as one of DEPCO's express powers, whereas Congress appears specifically to have granted such a power to the FDIC when it enacted FIRREA. Although the General Assembly could have used FIRREA, passed three years earlier, as a model for the DEPCO legislation, its insertion of the sweeping phrase "all powers necessary and convenient" in DEPCO's enabling statute obviated any need for the Legislature to endow DEPCO with the express power to acquire evidentiary privileges. And although a host of DEPCO powers are specifically set forth in § 42-116-5, the General Assembly added to this enumeration the caveat that any powers so specified were provided "without limiting the generality of the foregoing [broad grant of powers]."
Conclusion
In sum, both DEPCO's enabling legislation and the contractual terms by which DEPCO acquired the right to assert the attorney-client privileges formerly belonging to Marquette and to its receiver are broad enough to allow DEPCO's acquisition of these privileges with respect to the loan at issue. For these reasons DEPCO's petition for certiorari is granted. The order of the Superior Court compelling production of attorney-client documents is quashed, and the papers in this case shall be remanded to the Superior Court with our decision endorsed thereon for further proceedings consistent with this opinion.
BOURCIER, J., did not participate.
NOTES
[1] Marquette was placed into receivership in May receiver. 1991, and Maurice C. Paradis was appointed receiver.
[2] The circumstances surrounding the banking crisis are set forth in the act's legislative findings. See G.L.1956 § 42-116-2; see also Rhode Island DEPCO v. Brown; 659 A.2d 95, 98-99 (R.I.1995); In re Advisory Opinion to the Governor (DEPCO), 593 A.2d 943, 947 (R.I.1991).
[3] Before the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101-73, § 217(d), 103 Stat. 183, 256, 1989 U.S.C.C.A.N. 86 (amending the Federal Deposit Insurance Corporation Act (FDIC act), 12 U.S.C. §§ 11 et seq.), various federal experts struggled to determine whether the FDIC act empowered the Federal Deposit Insurance Corporation (FDIC) to assert the attorney-client privilege when it acquired its corporate capacity loans and other debt instruments from various federal lenders. See, e.g., FDIC v. Bank of Boulder, 865 F.2d 1134, 1141 (10th Cir.1988) (FDIC may acquire even a non-assignable 904, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991); FDIC v. Cherry, Bekaert & Holland, 129 F.R.D. 188, 193 (M.D.Fla.1989) (discussing split of authority); FDIC v. McAtee, 124 F.R.D. 662, 664 (D.Kan.1988) (transfer of assets does not generally transfer attorney-client privilege); FDIC v. Ellis, Civ. No. CV84-PT-2560-M, slip op. at 4 (N.D.Ala. Dec. 23, 1985) (FDIC/corporation may assert privilege in same manner as FDIC/receiver). See also Sobol v. E.P. Dutton, Inc., 112 F.R.D. 99, 103 (S.D.N.Y.1986) (in non-FDIC case, transfer of publishing rights did not carry privilege sufficient to resist document requests); 2 B. Dunaway et al., FIRREA: Law and Practice § 14.02[4][b][vii], at 14-24 (1994).