DECISION
When the drama of Rhode Island banking in the last decade of the Twentieth Century is played out, this case will take its place in the final act.
Among the protagonists will be the plaintiffs, Rhode Island Depositor Economic Protection Corporation ("DEPCO"), Allan Shine, receiver of Rhode Island Share and Deposit Insurance Corporation ("RISDIC") and Edward D. Pare, Jr., the latest ex officio receiver of Heritage Loan and Investment Corporation ("Heritage"). Others who play a role in the events alleged in this act are Benedetto Cerilli and Steven R. Salvatore, the incorporators of Jefferson Financial Group ("Jefferson Financial"), the owner of all the shares of common stock of Jefferson Loan and Investment Bank ("Jefferson"), and Joseph Mollicone, ("Mollicone"), the controller of Heritage. Joseph Mollicone needs no introduction to even the most casually interested spectator of events in the economic and political world of the 1990's in Rhode Island.
This case is an effort by the plaintiffs to cast the defendants in the role of villians in the nearly closed drama. The defendants are Fleet Financial Group and its wholly owned subsidiary Fleet National Bank (together, "Fleet"), a successor to a continuing line of historically successful banks in Rhode Island since late in the Eighteenth Century, and still the largest bank in Rhode Island, and the law firm of Edwards and Angell, including all the partners in the firm ("Edwards and Angell"), a long-standing and well-respected Rhode Island law firm. The defendants challenge that effort by moving to dismiss the claims alleged in the plaintiffs' complaint for failure to state claims upon which relief can be granted. Super. R. Civ. P.Rule 12(b)(6).
The story told by the plaintiffs, if well told, must at this juncture be taken to be true, whether or not there is or will be any evidence of its truth. Ellis v. Rhode Island Public TransitAuthority, 586 A.2d 1055, 1057 (R.I. 1991). The complaint describes two separate financing transactions which share the participation of Fleet and the similarity in the mechanics of each transaction. Edwards and Angell is accused of legal malpractice because of an opinion it rendered in a transaction involving Jefferson and Jefferson Financial.
 The Heritage Story Count I of the Complaint
On July 29, 1987 Mollicone went to Fleet to get $3.5 million added to the assets of Heritage, which, at the time, was being, or was about to be examined by state bank examiners. Mollicone gave Fleet his personal promissory note for $3.5 million and Fleet thereupon electronically credited one of Mollicone's personal accounts in that amount. Fleet then immediately electronically charged that account for that amount and, again electronically, issued a "certificate of deposit," "for the benefit of Heritage." That "certificate of deposit" was immediately pledged to secure the note executed by Mollicone to Fleet. The "certificate of deposit" was claimed by Heritage as an asset, but its pledge to secure the obligation of Mollicone to repay Fleet was not disclosed by Mollicone or Fleet. The balance sheet of Heritage was thereby falsely inflated by $3.5 million.
Fleet knew that neither Mollicone nor Heritage could control the funds represented by the certificate of deposit. Fleet further knew that the purpose of the transaction was to reflect a false inflation of Heritage's assets in its statements of its financial condition. By this transaction Fleet knowingly intended to deceive (1) RISDIC, which then insured Heritage's depositors, (2) the Department of Business Regulation (DBR), a department of the executive branch of the government of the State of Rhode Island, which was then responsible for examining Heritage, and (3) Heritage's investors and depositors, as to the true financial condition of Heritage.
Shortly after the transaction of July 29, 1987 the state examiners did conduct an examination of Heritage. They were deceived by the entries pertaining to the purported Fleet certificate of deposit. Also, RISDIC was deceived by the purported certificate of deposit in a financial report from Heritage on September 30, 1987.
Because of this deception by Mollicone and Fleet, Heritage remained in business and RISDIC continued to insure its deposits and members of the public continued to deposit their money in Heritage. Mollicone was able to embezzle funds from Heritage after July 29, 1987 until October 17, 1990, when RISDIC assumed control and operation of Heritage. Heritage was then thoroughly insolvent. RISDIC, accordingly, became obligated to pay millions of dollars to insured depositors in Heritage.
Finally, each plaintiff claims that as a direct and proximate result of the conduct of Fleet in conspiring with and aiding and abetting Mollicone in deceiving Heritage's examiners, insurer and depositors, they suffered substantial losses.
Restated in technical legal terms, the plaintiffs' claim sounds in common law fraud. The essential elements of such a claim are: (1) the defendant knowingly made a false representation, (2) intending thereby to induce the plaintiffs to rely on it; (3) the plaintiffs justifiably did rely on it, and (4) the plaintiffs were damaged by that reliance. See Cliftex Clothing Co., Inc. v.DiSanto, 88 R.I. 338, 344, 148 A.2d 273, 275 (1959). See alsoTravers v. Spidell, 682 A.2d 471, 472-73 (R.I. 1996).
The "short and plain statement of the claim" required by Super.R. Civ. P. Rule 8(a) for a complaint is modified by the requirement in Rule 9(b) that, "In all averments of fraud * * *, the circumstances constituting fraud * * * shall be stated with particularity."
The false representation. The plaintiffs allege with satisfactory particularity that Mollicone's representation that Heritage's assets included a $3.5 million obligation from Fleet, for which there was no corresponding liability, was false. They allege unequivocally that Fleet knew it was false. They further allege that Fleet knew that Mollicone would make such a false representation about the financial condition of Heritage.
The plaintiffs point out that they have alleged that not only did Fleet know that Mollicone would publish that false representation, but that Fleet intended that he make such a false representation. In effect, the plaintiffs have alleged that the entire transaction was a sham. No money went anywhere, they allege, much less into the control of Heritage. No other purpose could have been served, according to the plaintiffs, by this transaction except to earn Fleet a commission without any risk, and to inflate Heritage's financial appearance artificially. The first essential element of a common law fraud claim is fairly made out in these allegations. Fleet's knowing participation in a fraudulent scheme to deceive Heritage's bank examiners, its insurer and its depositors and investors is fairly stated.
The intent to induce reliance. The plaintiffs specifically allege that, "At all relevant times, Fleet knew and/or intended that RISDIC (whose receiver is a plaintiff), DBR (the State Department of Business Regulation, the agency charged with examining Heritage's books), depositors and investors would rely on Heritage's falsely inflated financial statements and reports." Although this allegation may be conclusory and is obviously "bare-bones," it does fairly notify Fleet of what it is particularly accused. The paragraphs following in the complaint allege that DBR was in fact deceived, and, although not alleged, it is clearly implied that RISDIC by virtue of the same deceit continued to insure Heritage's depositors. The complaint goes on to allege that depositors continued to deposit funds at Heritage.
The defendant Fleet contends that Rhode Island law of common law fraud requires that a fraudulent inducement must be communicated directly by a defendant to a plaintiff in order for the plaintiff to maintain a successful claim. They point out that DEPCO was not in existence on July 29, 1987. The allegedly false representation was not made to RISDIC, but to DBR, a governmental agency. No depositor or investor is alleged to have seen, heard, or even so much as known about the allegedly "sham" loan of $3.5 million by Fleet to Mollicone to improve Heritage's balance sheet. Fleet relies on Cliftex Clothing Co., Inc. v. DiSanto,supra, for the holding that a false representation must be made directly to a plaintiff in a fraud case, otherwise, the plaintiff will not be permitted to rely on the fraudulent representation.Cliftex does not support so far-reaching a proposition as that for which it is cited by Fleet. All that case holds is that under the fact situation there presented, because the fraudulent representation in a bulk sales affidavit was not addressed to the plaintiff transferee, it was not in fact induced to have relied on the affidavit. Cliftex did not exclude vicarious or indirect reliance by a foreseeable third party as the basis for a claim of fraud.
The Court has considered the learned opinion of Judge Lagueux in Forcier v. Cardello, 173 B.R. 973 (D.R.I. 1994). In that case the plaintiffs asserted a claim against the accountant defendants based on their negligent misrepresentations to DBR in the form of misleading financial statements which were part of prospectuses filed by an eventually insolvent debenture issuer. The plaintiffs claimed that, even if they could not prove that they were an intended or foreseeable recipient of the negligent misrepresentations, they were nonetheless entitled to rely on DBR's examination of the false statements and reports. The Court said:
 "While Rhode Island has specifically rejected the holding of privity required by Chief Justice Cardozo in Ultramares, Estate of Braswell by Braswell v. People's Credit Union, supra, 602 A.2d 510 (R.I. 1992), Rhode Island courts are still influenced in part by Cardozo's concern that there should not be `liability in an indeterminate amount for an indeterminate time to an indeterminate class.' Thus, this Court refuses to accept plaintiffs' theory of vicarious reliance on DBR. To hold otherwise would expose accountants to broader liability than the Restatement suggests. Moreover, pure, indirect reliance has not been recognized in Rhode Island." (Emphasis supplied). 173 B.R., at 988.
While indirect reliance in its purest form has not yet been recognized by Rhode Island courts, it has not been rejected. Indirect reliance is permitted in a less pure form, where such reliance is had by a person, who was intended as a recipient of the information and whose reliance is reasonably foreseeable.Rusch Factors, Inc. v. Hevin, 284 F. Supp. 85 (D.R.I. 1968). Seealso Restatement, Torts, Second, § 533. This Court declines to follow the course prescribed by the learned judge in theForcier case and to preclude any consideration of the application of the idea of indirect or vicarious reliance in this case.
This Court finds that it is clearly discernible in the complaint that Fleet is alleged to have intended to induce the entities named in the complaint to rely on the allegedly "sham" loan. To find otherwise would be to conclude that the transaction described in the complaint was a completely pointless exercise in which Mollicone paid Fleet a commission for nothing. Clearly, Mollicone wanted to "improve" Heritage's apparent financial position for other than esthetic reasons.
The justifiable reliance. Fleet argues that no plaintiff has actually alleged that it in fact relied on the allegedly fraudulent representation. They are mistaken. In paragraph 23 the plaintiffs allege that "DBR issued a favorable examination report to Heritage" as a result of the false entries made by Mollicone pursuant to his transaction with Fleet, obviously relying on the false representations. Paragraph 25 further contains the express allegation that, "As a result of the deception perpetrated by Fleet and Mollicone, Heritage remained in business, [and] depositors continued to deposit their funds there. . ." Heritage obviously remained in business in reliance on the allegedly fraudulently obtained favorable examination report. The implication that depositors relied on the alleged fraud in continuing to make deposits depends, for its validity, on whether they can rely on a doctrine of indirect or vicarious reliance.
Fleet points out that there is no specific allegation that RISDIC relied directly or indirectly on the allegedly false report of Heritage's financial condition. They are mistaken. In paragraph 24, the complaint alleges that the Fleet CD was falsely reported to RISDIC on September 30, 1987, as an asset of Heritage. RISDIC did not take over control of Heritage until October 17, 1990, according to paragraph 26, when it discovered Heritage was insolvent. It is discernible from these allegations that RISDIC claims that it delayed its assumption of control in reliance on the false report to it of $3.5 million of non-existent assets. RISDIC clearly alleges itself to be a defrauded plaintiff.
Notwithstanding that neither DBR, which is alleged in the complaint to have been deceived and to have directly relied on the deceit, nor the depositors, who are alleged to have been deceived through their reliance on DBR, are named as plaintiffs, DEPCO suggests that it may be deemed to have succeeded to their several claims, as well as to RISDIC's claims. DBR is an agency of the executive branch of the government of the state. See G.L.§ 42-14-1, et seq. The director of DBR is the administrator of banking and insurance and as such administers the functions of DBR relating to the regulation and control of banking and insurance within the state. § 42-14-15. At the time complained of, the director was required to examine the affairs of Heritage pursuant to § 19-20-6, as then in effect. Fleet contends that the only relief available to the public, or the state, for the fraud alleged in the Heritage transaction is the imposition of the criminal sanctions provided in former §19-19-1. It points out that the general assembly provided for no specific private right to relief for any person injured by a violation of § 19-19-1. Accordingly, even if depositors, as a class, were injured by the fraud alleged in the complaint, they were not entitled to relief. Since they were not entitled to relief, DEPCO cannot succeed, they say, to their claims for relief.
DEPCO was created by P.L. 1991, ch. 3, § 4 to address the banking crisis which ensued upon the failure of RISDIC and a number of RISDIC insured financial institutions. Legislative findings underpinning the act were set out in G.L. §42-116-2. Of particular pertinence is subsection (d):
 "(d) It is hereby further found that the establishment of a corporation is necessary to the essential public purposes of protecting the depositors of the financial institutions,
providing stability for financial institutions, promoting the welfare of the people of the state, and improving the economic welfare of the people of the state." (Emphasis supplied).
Section 42-116-5 empowers DEPCO "to do all things necessary and convenient to carry out and effectuate the purposes and provisions" of the law by which it was created. See Rhode IslandDepositors Economic Protection Corporation v. MaplerootDevelopment Corporation, 710 A.2d 167, 169, 170 (R.I. 1998). Sections 42-116-7 and 42-116-12 prescribe in exquisite detail how DEPCO is to make distributions to depositors in failed institutions like Heritage. Finally, § 42-116-32 establishes DEPCO's subrogation rights with respect to depositor's claims against a fairly limited class of third parties, but which clearly does not include a party such as Fleet, as alleged in this complaint. DEPCO is authorized by § 42-116-21 to accept funds appropriated by the general assembly, and a special revenue fund is established by § 42-116-31 to be funded by a portion of the sales and use tax. DEPCO became the instrumentality by which Rhode Island taxpayers rescued depositors in the failed institutions. DEPCO is required by § 42-116-12(i) to use the proceeds, if any, from this litigation to pay off its indebtedness incurred to raise funds for distribution to those depositors. Accordingly, to the extent RISDIC or Heritage, or both of them, had a fraud claim against Fleet, DEPCO has succeeded to that claim. In addition, because of DEPCO's public mission, it may well have succeeded to the state's claim for reimbursement for the fraud allegedly perpetrated on its agents, which has caused economic loss to the public.
Fleet contends that Heritage could not possibly have relied on Fleet's and Mollicone's alleged deceit because at the time Mollicone and Heritage were one and the same. Since Mollicone could not have deceived himself, the argument runs, Heritage cannot claim to have been deceived by Mollicone. Of course, Mollicone's knowledge might be imputed to Heritage in order to establish Heritage's vicarious liability to an innocent third party, but that knowledge should not be imputed to immunize a party from liability who is alleged to have joined with Mollicone to defraud Heritage. O'Melveny Myers v. FDIC, 512 U.S. 79, 114 S.Ct. 2048, ___ L.Ed.2d ___ (1994), cited by Fleet, does not hold to the contrary. That case merely held that the question of imputation of an agent's knowledge to a principal would be determined by applicable State common law, and not by Federal "common law." A Rhode Island receiver of a failed corporation is not bound by the fraudulent misconduct of agents in pursuing culpable third parties. See Hayes v. Kenyon, 7 R.I. 136 (1862). Heritage's receiver and his assignee, DEPCO, have standing to pursue Heritage's fraud claims against Fleet.
Causation. The plaintiffs tersely allege that Fleet's conduct caused them substantial losses in paragraph 27 of their complaint. Paragraph 25, however, alleges that as a result of the deception perpetrated by Mollicone, Heritage remained in business and Mollicone embezzled millions of dollars from Heritage. There is no allegation that Fleet had any knowledge of Mollicone's embezzlements, past, present or future at the time of the "sham" loan. At most, it can only be accused of knowledge of his intent to avoid discovery by the state examiners of Heritage's true financial condition in 1987. The continued operation of Heritage is alleged to have provided Mollicone with an opportunity to loot Heritage.
The complaint does not allege that Fleet had knowledge of Heritage's insolvent condition when it made the "sham loan." The complaint does not allege that the "sham loan" was knowingly designed to conceal or promote embezzlements already made by Mollicone, or if it was designed simply to get Heritage favorably past the examination then about to get underway, without any regard to Mollicone's embezzlements.
The complaint does not allege that Fleet knew that Mollicone had future embezzlement in his heart when he engaged Fleet in the "sham loan" transaction. Although it is not expressly alleged in the complaint, it is readily inferable that Mollicone's thievery was a substantial, if not the sole cause of Heritage's failure. The complaint does not allege that Fleet participated in Mollicone's crimes. It does not allege that Fleet could have foreseen them.
Notwithstanding all of those failures of allegation, the plaintiffs nonetheless argue that all that is required for them to survive dismissal under Rule 12(b)(6) is for them to allege, as they did in paragraph 27, that "Fleet's conspiracy with and aiding and abetting [of] Mollicone" to deceive the examiners proximately caused the plaintiff's eventual loss. The defendant Fleet argues that, unless Mollicone's criminality is alleged to have been foreseen or foreseeable by it, its deceit, if any, as claimed, has not been satisfactorily alleged to have caused the losses complained of by the plaintiffs. It urges that the unforeseeable criminal conduct of a third party such as Mollicone will cut off, as an independent intervening cause, any causation originating from its conduct. See Splendorio v. Bilray DemolitionCo., 682 A.2d 461 (R.I. 1996).
This argument framed in terms of proximate causation reaches to the core of a major legal issue presented in this litigation. Did Fleet do something wrong which the common law will remedy by awarding money damages to these plaintiffs? In its analysis up to this point this Court is satisfied that the complaint describes wrong-doing by Fleet that the common law recognizes as fraud. The Court is satisfied that these plaintiffs have alleged that they can properly complain of that fraud. The proximate cause question reaches deep into a jurisprudential question. When does a wrong-doer cease to be liable for the consequences of its conduct? The ancillary procedural question is: When in the course of litigation does the law cut off a wrong-doer's liability?
The Nineteenth Century case of Mahogany v. Ward, 16 R.I. 479,17 A. 860 (1889) contains some helpful discussion of principles which might be useful here. The plaintiff in that case was injured when her carriage struck a post at the side of a public highway. In her action against the town responsible for the maintenance of the highway, the town argued that the plaintiff's injuries were caused not by its negligence but by the failure of an approaching carriage to yield one-half the highway to her, thereby forcing her into collision with the pole.
The case raised the question of whether the town's negligence was cut off by the negligence of the third party on the highway. The Court ruled that the independent act of a responsible person arrests causation, being regarded as the proximate cause of the injury, the original negligence being considered merely as its remote cause. The Court went on to hold that, ". . .it is the proximate and not the remote cause which is regarded, he who is guilty of the original negligence is not chargeable, but redress must be sought from him who directly caused the injury." Id., at 481. The Court nevertheless recognized an important qualification that, ". . . if the intervening act is such as might reasonably have been anticipated as the natural or probable result of the original negligence, the original negligence will, notwithstanding such intervening act, be regarded as the proximate cause of the injury, and will render the person guilty of it chargeable." Id., at 483. A new trial was ordered.
The statement of the rule and its qualification at the level of abstraction propounded in Mahogany, supra, while helpful, is clearly not dispositive of the issues presented here. D'Ambra v.Peak Building Corp., 680 A.2d 939 (R.I. 1996) is remarkably similar on its facts to Mahogany, supra. The plaintiffs claim to have been injured by a dangerous condition on the highway when the negligent operation of a third party forced the plaintiff's vehicle into the dangerous condition. The D'Ambra Court applied the Mahogany rule in affirming a judgment as a matter of law for the defendant in the trial court. An important consideration is that the holdings in both Mahogany and D'Ambra came after evidence had been presented at a full trial of the merits of the respective plaintiff's claims.
Under all the circumstances potentially provable under the allegations of this complaint, this Court cannot find beyond a reasonable doubt that Fleet's alleged conduct is so remote a cause that it was unforeseeably cut off by Mollicone's thievery. At this stage of this litigation it would be unjust to dismiss this complaint without considering what the discoverable evidence shows about Fleet's actual, implied and imputed knowledge about Mollicone and Heritage. It is not time to consider what inferences as to foreseeability can be drawn from the facts which may be provable at trial.
After careful consideration of the complaint and the memoranda and arguments of counsel, the Fleet defendants' motion to dismiss Count I of the complaint is denied.
 The Jefferson Story Counts II and III of the Complaint
The tale of the ill-fated Jefferson bank has a similar plot to that of Heritage with a slightly different cast of characters. The two narratives share not only a similar plot but Fleet is alleged to play a starring role in each drama.
According to the complaint, on December 1, 1987 Fleet purported to loan $1 million to an entity called Jefferson Financial. Jefferson Financial had been organized by the shareholders of Jefferson to purchase all of the outstanding shares of Jefferson with the purported proceeds from the loan from Fleet. Jefferson used the proceeds of the purported loan to purchase a certificate of deposit from Fleet. Jefferson also guaranteed payment of Jefferson Financial's indebtedness to Fleet and pledged the certificate to secure the guaranty. According to the complaint, no money, let alone cash, changed hands in this transaction, a situation strikingly similar to that in Heritage.
The whole purpose of the convoluted financial paper-shuffling in December 1987, it is alleged, was to satisfy a statutory requirement that Jefferson have $1 million of capital paid for in cash before it could accept deposits. The Fleet certificate of deposit, if it had belonged to Jefferson without impairment, could have satisfied that requirement.
The plaintiffs allege that Fleet, through its agents, falsely represented to DBR that Jefferson had $1 million on deposit at Fleet, and that the money was not encumbered. Fleet knew that DBR, the Board of Bank Incorporators and RISDIC would rely on its false representations to allow Jefferson to operate as a loan and investment bank. In fact, the plaintiffs allege, Jefferson was permitted to operate and RISDIC did insure deposits all in reliance on Fleet's false representations. The complaint categorically alleges in Count II that Fleet intended to deceive the Board, DBR and RISDIC, or, in the alternative, in Count III, that Fleet's misrepresentation was negligent. On February 16, 1990 RISDIC assumed control and operation of Jefferson, and thereupon became liable for over $13 million in customer deposits, for which, presumably Jefferson did not have sufficient assets to pay. The receiver of RISDIC brings this fraud and negligent misrepresentation claim against Fleet for the loss it sustained in insuring Jefferson's depositors. While DEPCO may be the beneficiary of a successful claim by the plaintiff in this claim, it is not, itself, a plaintiff.
The false representation. The complaint clearly alleges that Fleet falsely represented that Jefferson had $1 million on deposit unencumbered with Fleet. That false representation was made either intentionally or negligently. The complaint alleges that the false representation was made to agents of DBR at the time Jefferson became first authorized to take deposits and continually thereafter until December 22, 1989.
The justified reliance. Fleet argues that the depositors in Jefferson, itself, and the insurer of its depositors, RISDIC, are not entitled to rely on representations made to the state's licensing and regulatory agency. This Court has already dealt with this issue in dealing with the claims against Fleet arising from the Mollicone — Fleet — Heritage transaction. It is even more clear in the setting of the Jefferson Financial — Jefferson-Fleet transaction that depositors and the deposit insurer would rely on Fleet's representations of paid in capital in cash, even more when a new depository was beginning than in the Heritage situation, where an existing depository simply remained in business. The only purpose the Jefferson transaction could have had was to launch an illegally undercapitalized financial institution onto an unsuspecting public and to fool the deposit insurer. At this stage, it is legitimate to require that Fleet either deny it made the allegations it is alleged to have made, or explain that there was some non-deceptive purpose for the representations to DBR and the Board.
Causation. Like reliance, causation is at least as clear in this claim, as alleged, as it appears in the Heritage situation. Without the reliance on the false representations of Fleet, as the plaintiffs claim, Jefferson would not have been created. If Jefferson had not been created there would have been no lost deposits for RISDIC to have paid. No wrongful creation, no loss.
In this claim no criminal wrong-doing like that of Mollicone appears as a superseding intervening cause of RISDIC's loss. Nothing in the allegations of the complaint show that even if Jefferson had had the $1 million of unencumbered capital it would not have failed. Nor is it alleged that the shortage of $1 million in cash capital caused or contributed to Jefferson's failure.
This Court cannot say beyond a reasonable doubt, as it must to grant this motion, that it will be impossible for the evidence to show that the failure of Jefferson was proximately caused by its defective capitalization or its creation. Nor can it say with the requisite certainty that at the time of the false representation Fleet could not foresee the unreasonable risk of failure by an illegally undercapitalized deposit-taking institution.
Materiality. Fleet argues that its representation that Jefferson was originally capitalized in cash was not material, because RISDIC's claim is derived from the claim of depositors insured by RISDIC, and the method of capitalization was lawful. This Court has already decided, as a matter of law, that the encumbered certificate of deposit held by Fleet as security for its loan to Jefferson's sole shareholder, Jefferson Financial, was neither cash nor its equivalent as required by the statute. Fleet's false representations, if they were made, as alleged, were plainly material.
Fleet's motion to dismiss Counts II and III of the complaint is denied.
 Edwards and Angell Count IV of the Complaint
The receiver of RISDIC sues the law firm of Edwards Angell for professional negligence in advising Jefferson and Fleet with respect to the method employed by the share-holders of Jefferson Financial to capitalize Jefferson with $1 million in cash.
This Court has already ruled that the method of capitalization employed, pursuant to Edwards and Angell's advice, did not comply with statutory requirements.
This count of the complaint is a simple straightforward statement of professional negligence.
It would be inappropriate to dismiss it for failure to state a claim.
The motion to dismiss this count by the Edwards and Angell defendants is denied.