July 8, 2020

**Supreme Court**

No. 2017-312-C.A.

(W1/13-193A)

State                    :

v.                    :

Daniel E. Doyle, Jr.          :

NOTICE:    This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| :--- | :--- |
| v. | : |
| Daniel E. Doyle, Jr. | : |

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.** This case came before the Supreme Court on January 22, 2020, on appeal by the defendant, Daniel Doyle, from a judgment of conviction following jury verdicts of guilty on eighteen counts of financial fraud crimes under the Rhode Island General Laws. The trial justice sentenced the defendant to a total of seven years to serve in prison, with the balance of the eighteen concurrent sentences suspended, with probation. The defendant timely appealed. For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

### Facts and Travel

The criminal prosecution giving rise to this appeal arose from defendant's long-term tenure as executive director of the Institute for International Sport (the Institute), a Rhode Island nonprofit corporation formed in 1987. Essentially, allegations of defendant's decades-long abuse of power and larcenous behavior as director of the Institute eventually spawned a grand jury investigation and these convictions.

The Institute was founded in May 1987, with the laudatory goal of "expanding the opportunities for young people around the world to participate in sports activities in order to improve and develop their capabilities[.]" Initially, the Institute was housed in Adams Hall, a building owned by the University of Rhode Island (URI or the University) and located on URI's Kingston campus. The Institute was well known for conducting the "World Scholar-Athlete Games" every four years, from 1993 until 2011, during which young students from countries across the world traveled to Rhode Island to participate in team-based activities, meet students from other countries, and learn about topics such as ethics.[1]

The Institute's by-laws specified that any financial commitment or other significant decision must be approved by a vote of the Institute's board of directors. The board also was charged with oversight of the executive director, who—for virtually all of the Institute's existence—was defendant. As the trial record established, while there may have been some semblance of corporate governance in place when the Institute was incorporated in May 1987, over time, any pretense of legitimate corporate governance completely disappeared. The absence of corporate governance—and the brazen manner in which defendant took advantage of the lack of oversight—led to the criminal acts for which he was convicted.

The fact that meaningful oversight from the board of directors was, at best, *de minimis* throughout the Institute's history is mirrored in defendant's statement that the board members were mere "figureheads," and in testimony at trial establishing that the purported members of the

---

[1] Alan Hassenfeld, a former chairman and CEO of Hasbro, Inc., and one of the victims of defendant's financial fraud, testified at trial. Mr. Hassenfeld provided detail about the World Scholar-Athlete Games. It was clear from his testimony that he became involved with the Institute because he believed in the World Scholar-Athlete Games and the vision of the Institute. Mr. Hassenfeld was offered and accepted the position of chairperson of the World Scholar-Athlete Games. Crucially, he also began using the Hassenfeld Family Foundation (the Hassenfeld Foundation)—the philanthropic group he led—to provide financial support for the Institute.

board of directors never held board meetings.  For over two decades, defendant ran the day-to-day affairs of the Institute, exercising rigid control over the employees and all of the Institute's projects.  In its infancy, however, the Institute was not without some accountability.  For example, when the Institute's office was in Adams Hall, the University required proper documentation of the expenses that it had agreed to pay on the Institute's behalf, with the expectation of reimbursement.  Moreover, David Florence, an accountant who prepared reports and budgets and handled accounts payable, from roughly 1992 to 2004, also provided some degree of fiscal control.  Once Florence left the Institute in 2004, however, there was scant fiscal control.  From that point forward, employees who attempted to create order in the Institute's finances were either abruptly removed by defendant or resigned in frustration.

The evidence demonstrated that the offenses for which defendant eventually was convicted arose out of his activities during this period of exiguous accountability, beginning in the early 2000s.  After several years in Adams Hall, the Institute relocated its offices to the "Hall of Fame Building," a recognizable campus structure located on Kingstown Road in Kingston.  One building was not enough.  At some point, defendant decided that the Institute needed a second building, which would be called the "Leadership Building."  He proceeded to solicit funds from several sources, including—but not limited to—Alan Hassenfeld, a former chairman and CEO of Hasbro, Inc., and Alan Shawn Feinstein, a well-known Rhode Island philanthropist. Funds were also secured from the State of Rhode Island in 2007, in two grants from the General Assembly's Joint Committee on Legislative Services (JCLS), which totaled $575,000.  The evidence disclosed that these grants were sufficient to pay the cost of construction of the Leadership Building.

Although work commenced on this project, the building was never completed. Ms. Marisa White—a hero in this saga—was the director of JCLS during that period. According to White, she drove by URI's campus in 2009—well after the disbursement of the grant money—and discovered that the Leadership Building was still under construction even though it should have long been completed. She contacted the Speaker of the House of Representatives to notify him that the construction was not completed. In 2011, she again notified the Speaker that the building remained unfinished. This call prompted an investigation by JCLS, which was referred to the office of the state Auditor General, Dennis Hoyle.

The Auditor General issued a report on his findings in February 2012, and a grand jury investigation into defendant and the Institute ensued. The grand jury investigation resulted in an eighteen-count indictment, charging defendant with seven counts of embezzlement in violation of G.L. 1956 § 11-41-3, one count of obtaining money under false pretenses under §§ 11-41-4 and 11-41-5, five counts of forgery in violation of G.L. 1956 § 11-17-1, and five counts of giving false documents to an agent, employee, or public official in violation of G.L. 1956 § 11-18-1.

The defendant filed motions to dismiss the indictment, and to suppress all of the evidence obtained as a result of the search of *any place* or the seizure of *any thing* of his or that of the Institute.[2] The trial justice denied both motions. The defendant filed a pretrial motion *in limine*

---

[2] In his motion to suppress, defendant purported that:

> "Specifically, the State violated the Defendant's rights against unreasonable search and seizure by:
> "1. Seizing via 'consent' the Thumb Drive from [WITNESS #1] (containing stolen IIS documents purportedly dictated by the Defendant in 2011);
> "2. Seizing the attorney-client privileged documents from the IIS office computer of [WITNESS #2]; and
> "3. Seizing via 'consent' the box of stolen IIS documents from [WITNESS #3]." (Brackets in original.)

to exclude various pieces of evidence and the testimony of witnesses on the basis of Rules 403 and 404 of the Rhode Island Rules of Evidence. The motion *in limine* also was denied, and is discussed in greater detail *infra*.

Trial commenced on September 19, 2016, and lasted twelve weeks, with over sixty-five witnesses and hundreds of exhibits. On December 5, 2016, the jury returned guilty verdicts on all eighteen counts. The defendant subsequently moved for a new trial, as well as a motion in arrest of judgment pursuant to Rule 34 of the Superior Court Rules of Criminal Procedure.[3]

In a lengthy and comprehensive decision, the trial justice denied defendant's motion for a new trial and his motion in arrest of judgment. The trial justice thoroughly reviewed the facts of the case and concluded that the evidence at trial established beyond any doubt that the board of directors "was a chimerical product of the [d]efendant's incessant and far-flung chicanery." The trial justice's review of each count and the denial of the motion for a new trial as to each count highlighted the pertinent facts established at trial. For example, as to count one, embezzlement arising out of defendant's unauthorized second salary from the Institute, the trial justice stated that the testimony at trial irrefutably established that defendant had taken an unauthorized salary from 2005 through 2011 totaling $501,538.52. As to count two, embezzlement arising out of unauthorized loan repayments and bonuses taken by defendant, defendant withdrew $251,157.92 from the Institute, payable to himself. Several of the other counts for embezzlement and the evidence offered to prove them established that defendant helped himself to $117,274.41 of the Institute's resources to support summer programs he organized independently from the Institute,

---

[3] In support of his motion for new trial, defendant advanced several arguments that became the basis for the arguments he now raises on appeal. In support of his motion in arrest of judgment, defendant argued that events that occurred before and during the grand jury proceedings in this case substantially and illegally influenced the decision to indict him, thereby denying him due process as guaranteed under the constitutions of the United States and of the State of Rhode Island. This argument is not pressed on appeal.

and to fund his for-profit publishing company. The remaining embezzlement counts arose out of unauthorized payments on an American Express card in the amount of $145,332.36; unauthorized tuition payments to his daughter's private high school and college totaling $98,947.97; and unauthorized donations in his name to defendant's alma mater, Bates College, in the amount of $22,300.

Turning to count eight, obtaining money under false pretenses, the trial justice found that defendant duped Alan Hassenfeld, finding that "[t]he ever-altruistic Mr. Hassenfeld, unsparing in his financial and moral support of the [d]efendant's vision, had been betrayed[,]" after defendant diverted almost $550,000 of the money that Mr. Hassenfeld pledged for the Leadership Building for his personal benefit. As to counts nine through eighteen, the trial justice also reviewed the evidence and found that the credible testimonial evidence and the documents presented established unequivocally that the offenses had been proven beyond a reasonable doubt; she denied the motion for a new trial as to those counts as well. Finally, in denying defendant's motion for arrest of judgment, the trial justice found that there were neither infirmities in the indictment nor any defects in jurisdiction.[4]

The defendant was sentenced on August 10, 2017, to seven concurrent terms of fifteen years, with seven years to serve, and six terms of ten years, with five years to serve, with the remainder of those terms suspended with probation; five terms of one year, suspended with probation; and restitution. All terms were to run concurrently. A judgment of conviction and commitment was entered on that same date. The defendant appealed to this Court on August 11,

---

[4] In arriving at her decision, the trial justice reiterated her conclusion that there was no attorney-client privilege in existence at any time between attorney William J. Lynch and defendant. The issue of attorney-client privilege is discussed in greater detail *infra*. The trial justice also found that there was no e-mail or privileged communication capable of forming a basis for defendant's motion, and she deemed groundless defendant's assertion that the function of the grand jury was "thwarted" and that the indictment was defective.

2017. He also moved for release on bail pending appeal, and that motion was denied on September 7, 2017. We address each of defendant's appellate contentions separately, and we shall provide additional facts and procedural history as necessary.

## Issues on Appeal

Before this Court, defendant raises eight issues on appeal: (1) the trial justice improperly allowed the use of prejudicial evidence in violation of Rule 404(b); (2) the trial justice improperly permitted a Rhode Island State Police detective to provide expert opinion testimony as a lay witness; (3) the trial justice erroneously allowed an improper waiver of the attorney-client privilege; (4) the State of Rhode Island knowingly or recklessly presented false evidence at trial; (5) the trial justice erred when she denied defendant's motion to suppress evidence he claimed was illegally obtained by state action; (6) the trial justice erred when she failed to grant a mistrial after a prosecutor made an improper remark in the courtroom; (7) the embezzlement convictions contravene the weight of the evidence; and (8) the evidence is insufficient to support the charges of embezzlement and larceny by false pretenses. None of these arguments have merit. Although most of defendant's contentions were not properly preserved for appellate review, we shall address them nonetheless.

## Rule 404(b) Evidence

The defendant's first argument on appeal is that the trial justice erred in permitting evidence, which spanned two weeks of trial testimony, that, he contends, solely related to his bad character and thus was inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence. The defendant's argument consists of a broad-based attack against a significant amount of the state's evidence and a host of prosecution witnesses. The defendant assigns error to the evidence surrounding the JCLS grant for the construction of the Leadership Building, the Institute's

- 7 -

financial transactions (and indebtedness) to the University, and events occurring in "the 1990s and early 2000s[.]"

On September 19, 2016, defendant filed a motion *in limine* to preclude the state from introducing evidence that he contended was inadmissible under Rules 403 and 404 as "bad character evidence." After a hearing on the motion, the trial justice denied relief, stating that, facially, the state's planned evidence appeared relevant, and not in contravention of Rule 404(b). Like all decisions on motions *in limine*, this was a preliminary ruling. The trial justice stated that she would decide, *during trial*, whether evidence should be admitted in accordance with Rule 404(b). She also stated that it would be "impossible and inequitable" for the court to rule on the motion "in a vacuum without having heard a word of testimony[,]" and that the court would not completely exclude a witness from appearing at trial. The defendant made no further argument, and trial commenced.

## Standard of Review

When an issue concerning the admission or exclusion of trial evidence is properly preserved for appellate review, this Court employs an abuse of discretion standard of review. *State v. Clements*, 83 A.3d 553, 561 (R.I. 2014). "Accordingly, 'we will reverse a trial justice's ruling on the admissibility of evidence only where it constitutes a clear abuse of discretion.'" *Id.* (brackets omitted) (quoting *State v. Pona*, 66 A.3d 454, 465 (R.I. 2013) (*Pona II*)).

However, the raise-or-waive rule is a fundamental principle in this state that is "staunchly adhered to" by this Court. *Cusick v. Cusick*, 210 A.3d 1199, 1203 (R.I. 2019) (quoting *Rohena v. City of Providence*, 154 A.3d 935, 938 (R.I. 2017)). "[I]t is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *Id.* (quoting *Rohena*, 154 A.3d at 938). However, "[w]e have recognized that an exception to the

raise-or-waive rule arises when basic constitutional rights are involved[.]" *Id.* at 1204 (quoting *In re Miguel A.*, 990 A.2d 1216, 1223 (R.I. 2010)). For the exception to apply, "the alleged error must be more than harmless, and the exception must implicate an issue of constitutional dimension derived from a novel rule of law that could not reasonably have been known to counsel at the time of trial." *Id.* (quoting *In re Miguel A.*, 990 A.2d at 1223); *see State v. Burke*, 522 A.2d 725, 731 (R.I. 1987) (providing that the exception may apply, for example, "when an intervening decision of this [C]ourt or of the Supreme Court of the United States establishes a novel constitutional doctrine" during the course of a trial).

**Analysis**

On appeal, defendant points to this Court's recent decision in *State v. Rainey*, 175 A.3d 1169 (R.I. 2018), and argues that before "allowing the introduction of bad character evidence, the trial court must conduct an analysis to determine not only the relevancy and materiality of the proffered evidence but whether it falls into an exception under Rule 404(b) and, if so, whether the prejudicial nature of the evidence outweighs its probative value." The defendant argues that the trial justice erred in failing to perform this analysis and in failing to provide a limiting instruction to the jury.

The state responds that defendant's arguments suffer from several legal misconceptions, that the issue of Rule 404(b) was not properly preserved at trial, and, alternatively, that defendant's arguments fail on the merits. The state contends that the trial justice appropriately made clear that her pretrial *in limine* decision was subject to the presentation of evidence, and that defendant failed to create an appropriate appellate record by way of objections with respect to the Rule 404(b) issues as they arose at trial. The state argues that a purported continuing objection by defendant before trial, to evidence concerning the JCLS grant, was not satisfactory

to develop a reviewable record. The state also argues that any challenged evidence was properly admitted, and alternatively that, were the Court to assume that some evidence of defendant's prior misconduct should have been excluded under Rule 403 or Rule 404(b), any such error was harmless.

After a careful review of the voluminous record, we are constrained to conclude that these issues were not preserved for appellate review and are therefore not properly before the Court. We note at the outset that the use of a continuing objection during a criminal trial based on the admissibility of testimony on a question-by-question basis is of little utility. These defects are magnified when the objection concerns the wholesale exclusion of a series of witnesses simply because there is not a corresponding count in the indictment that relates to the witness's testimony. The basis of defendant's shotgun challenge rests on his contention that the testimony of several of the state's witnesses concerning the JCLS grant "related solely to Rule 404(b) bad character evidence" and, on appeal, defendant suggests that evidence was improperly admitted not only during the state's case-in-chief, but also throughout the entire twelve week trial, generally. We disagree.

Rule 51 of the Superior Court Rules of Criminal Procedure governs the use of continuing objections and, notably, the rule has been amended since defendant's trial was concluded. Although the amendment is not controlling in the context of our review of the case at bar, it clearly illustrates the limited viability of defendant's continuing objection. At the time of trial, the text of Rule 51 provided:

> "Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which the party desires the court to take or his or her objection to the action of the court and his or her grounds

> therefor if requested; *and if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice the party. With the consent of the court a party may object to an entire line of testimony, or to the entire testimony of a witness, or to testimony on a single subject matter, and if such objection shall be overruled, it shall not be necessary for the party to repeat his or her objection thereafter, but every part of such testimony thereafter introduced shall be deemed to have been duly objected to and the objection overruled.*" Super. R. Crim. P. 51 (2016) (emphasis added).

When Rule 51 was amended in 2017, the emphasized language was eliminated. This Court has never declared that a continuing objection is available to challenge the denial of a motion *in limine*. Unquestionably, there can be no valid continuing objection to evidence, the admission or exclusion of which has not yet been decided. Although defendant was procedurally *permitted* to make a continuing objection, which the trial justice graciously granted, we cannot overlook the fact that the trial justice had yet to rule on this evidence at trial. There must be an adequate trial record for appellate review, particularly in the context of a lengthy criminal trial or, as here, when the reach of the motion *in limine* was so expansive. We do not recognize a wholesale challenge to the introduction of evidence in the absence of specific grounds for its exclusion. Because trial justices are required to engage in balancing relevance against potential prejudice under Rule 403, there must be a cogent Rule 404(b) argument in the context of a given piece of so-called "bad acts" evidence. *See State v. Franklin*, 103 R.I. 715, 728, 241 A.2d 219, 227 (1968) (holding that the contemporaneous objection rule "is designed both to alert the trial justice's attention to the issue raised and to insure a record on appeal which will focus on precise questions" and that "[i]t provides an orderly means for adjudicating criminal matters").

It is well settled that, under this Court's raise-or-waive rule, "if an issue was not preserved by *specific* objection at trial, then it may not be considered on appeal." *Pona II*, 66 A.3d at 468 (quoting *State v. McManus*, 990 A.2d 1229, 1237 (R.I. 2010)). In fact, "[w]e require

- 11 -

a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it." *Id.* A specific objection at trial is also beneficial to the extent it creates an adequate record for appeal to this Court. In the case at bar, defendant failed to proffer specific objections, and instead merely set forth a blanket objection to entire lines of witness testimony, before any evidence was offered at trial.

However, defendant has pointed to seven instances of alleged error and suggests the issue of Rule 404(b) was adequately raised, beyond his continuing objection. After a careful review of these contentions, and the trial transcript, we are of the opinion that defendant's objections were insufficient to preserve the issue for appellate review.

For example, defendant identifies the following exchange that took place on September 28, 2016, the sixth day of trial, after several witnesses had appeared and testified, or had not yet been called to the witness stand; defendant reminded the court that he sought the wholesale exclusion of a bevy of witnesses:

> "[DEFENSE COUNSEL]: Out of an abundance of caution, Your Honor, understanding the Motion in Limine with respect to the introduction of the evidence and the, that's, we've gone through with respect to the building grant, which is uncharged.
>
> "THE COURT: Right.
>
> "[DEFENSE COUNSEL]: I won't belabor the issue, and I'm sure [the prosecutor] will agree that we've talked about this at length, but I just wanted to ensure that the record was being preserved, Your Honor, with respect to the testimony after Mr. Hoyle * * *.
>
> " * * *
>
> "[DEFENSE COUNSEL]: -- and the following witnesses, Mr. Revens, Mr. Montalbano, Mr. Falcone, Ms. Amerantes, and * * *.
>
> " * * *
>
> " * * *

"[DEFENSE COUNSEL]: [Mr.] Falcone * * *. *With respect to a standing and running objection with respect to the nature and substance matter, their testimony, as well as any exhibits introduced with respect to their testimony.*

"THE COURT: And, once again, [defense counsel] earlier graciously allowed the Court to preserve the objection and *defer argument* so we could accommodate the time of the witnesses and the Jury." (Emphasis added.)

Our careful review of the record demonstrates that defendant's contentions do not align with the requirements of Rule 404(b) because defendant sought to preclude a list of witnesses from testifying *ab initio*.

Nonetheless, we shall address defendant's arguments in order to make clear that, were the issue properly before the Court, it is without merit. The defendant first argues that the evidence was improperly admitted under a "reasonably necessary" standard, contending that Rule 404(b) evidence should be used sparingly and only when reasonably necessary. The defendant relies on this Court's decisions in *State v. Jalette*, 119 R.I. 614, 382 A.2d 526 (1978), and *Rainey*, cited *supra*, to argue that the evidence was not reasonably necessary to the state's case and was improperly admitted by the trial justice, who also failed to conduct analyses under Rules 404(b) and 403. This argument is incorrect.

Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." R.I. R. Evid. 404(b). However, the same rule permits the introduction of evidence of other conduct, including conduct of a criminal nature, for other purposes, such as to show a defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident[.]" *Id.* This Court has held that those purposes are but examples, "rather than a complete enumeration, of permitted purposes." *State v. Ciresi*, 45 A.3d 1201, 1213 (R.I. 2012)

- 13 -

(quoting *State v. Rodriguez*, 996 A.2d 145, 150 (R.I. 2010)). Evidence of a defendant's conduct may also be admitted in order for the trier of fact to hear a complete and coherent set of events that underlie the crimes on trial. *Id.* at 1214.

When a defendant is charged with a sexual offense, the "reasonable necessity" standard for admission on which defendant relies is applicable: Evidence of uncharged sexual misconduct may not be admitted unless it is relevant to proving the charge lodged against the defendant and when "reasonably necessary." *Rainey*, 175 A.3d at 1182 (quoting *State v. Mohapatra*, 880 A.2d 802, 806 (R.I. 2005)). This judge-made rule has no applicability in cases that do not involve sexual assault. In non-sexual crimes, the state must demonstrate the evidence's "independent relevance[.]" *Ciresi*, 45 A.3d at 1213 ("[E]vidence of a separate crime may be admissible if it has independent relevance in respect to the proof of an element material to the chain of proof of the crime in issue.") (quoting *State v. Lemon*, 497 A.2d 713, 721 (R.I. 1985)). Thus, defendant's appellate contentions are erroneous.

Applying the appropriate "independent relevance" standard to the introduction of this evidence, we are satisfied that the trial justice was well within her discretion in admitting the disputed testimony. The trial justice declared, and we agree, that the testimony elicited from the state's witnesses was independently relevant for a complete and coherent presentation of the events underlying the numerous and complex crimes in this case. *See Ciresi*, 45 A.3d at 1214 (evidence of other crimes, wrongs, or acts is admissible when the conduct is interwoven with the crime on trial or "in instances when introduction is necessary for a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence") (quoting *State v. Pona*, 948 A.2d 941, 950 (R.I. 2008) (*Pona I*)).

Furthermore, although defendant characterizes all of the evidence as "uncharged bad character evidence" under Rule 404(b) because, he contends, defendant was not charged "with any improprieties regarding the state grant[,]" we do not agree with defendant's hypothesis that any testimony not specifically directed to the crime of embezzlement amounts to Rule 404(b) bad character evidence. This is not a case in which defendant stole money directly from the state. However, the JCLS grant money was paid to the Institute and the circumstances surrounding the grant were highly relevant. The defendant stands convicted of embezzling a whopping amount of money from the Institute, over several years, and engaging in a monumental scheme to obfuscate inquiry into his charged misconduct. The evidence in this case established that defendant lied to the Auditor General during the audit that was precipitated by the JCLS; he submitted false and forged documents to the auditor and drafted phony correspondence in the name of third parties without their knowledge or consent. This is evidence of defendant's intent and motive to prolong his "far-flung chicanery" and coverup, as well as his consciousness of guilt. It is so interwoven with the charged misconduct as to be independently relevant. The trial justice admitted this evidence at trial because the failure to complete the Leadership Building, which led to the grant audit, resulted in the grand jury investigation and this indictment. The defendant's subterfuge during the audit was highly relevant on the crucial element of defendant's intent and constituted evidence that the incomplete building was not the result of poor bookkeeping or mistake. In fact, defendant's conduct can fairly be ascribed to the entirety of the reasons that underlay Rule 404(b) as proof of defendant's motive, intent, plan, scheme, and opportunity.

A defendant in a criminal case is not entitled to a sanitized version of the facts. *See State v. Peltier*, 116 A.3d 150, 156 (R.I. 2015). "[A] defendant has no right to be insulated from

relevant truths even if such truths might lead the jury to draw less favorable inferences concerning the defendant than if they were not exposed[,]" or if the facts lay bare the image the defendant seeks to protect. *Id.* (brackets omitted) (quoting *State v. Acquisto*, 463 A.2d 122, 129 (R.I. 1983)). The trial justice properly exercised her discretion in allowing this evidence. The mere fact that this evidence is prejudicial to a defendant does not compel its exclusion. *See State v. Brown*, 900 A.2d 1155, 1164 (R.I. 2006).

The defendant also contends that the quantity of this other act evidence was so voluminous that it overshadowed the state's proof of the charges in the indictment, and that a proper Rule 403 analysis would have led to its exclusion. We reject this contention. The trial justice held that the JCLS evidence was the very foundation of the state's case and that it was "very very relevant to the course of conduct and the representations that were made by Mr. Doyle." In reaching this conclusion, the trial justice properly struck the balance between the probative force of the evidence and its potential prejudice, as required by Rule 403. As that rule dictates: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." R.I. R. Evid. 403.[5]

Lastly, based on the extensive record in this case and the overwhelming evidence presented at trial, we are of the opinion that, even if there were evidentiary error, it was harmless beyond a reasonable doubt. *See Ciresi*, 45 A.3d at 1215 ("Nevertheless, in light of the overwhelming amount of evidence presented against [the defendant] in his trial, we are satisfied

---

[5] In addition to the JCLS evidence, defendant has set forth additional Rule 404(b) claims concerning the Institute's debt to URI and testimony by Lorna Prout, a witness discussed *infra*, about forged documents. These issues have no merit.

- 16 -

that this determination by the trial justice, even if error, was harmless beyond a reasonable doubt."); *State v. Oliveira*, 961 A.2d 299, 312 (R.I. 2008) ("Notwithstanding the finding of a constitutional violation, this Court will not vacate a criminal conviction if the error was harmless to a defendant.").

Accordingly, we hold that this issue was not properly preserved for appellate review, but that, even if it had been, the trial justice did not abuse her discretion in admitting the challenged evidence.

**Detective Elliott's Opinion Testimony**

The defendant's second argument on appeal is that the trial justice committed reversible error by allowing Detective Courtney Elliott of the Rhode Island State Police to provide opinion testimony as a lay witness. Detective Elliott was the final witness to testify in the state's case. At the time of trial, Det. Elliott had been a member of the Rhode Island State Police for seven years and had served for four years as a detective. She was a member of the Financial Crimes Unit. Detective Elliott testified that she holds a bachelor's degree in accounting, as well as a master's degree in criminal justice. She was also a certified fraud examiner, a certification she earned on the basis of her education, experience, coursework related to the certification, and an examination. Before joining the state police, Det. Elliott worked as an accountant for an executive search firm in Chicago, performing bookkeeping and financial analysis for two of the company's offices, preparing financial reports, and auditing expense reports from some of the firm's consultants.

Detective Elliott testified that the state police inquiry into the Institute began in February 2012 and that she joined the investigation in June 2012. It was her responsibility to determine which, if any, of defendant's expenses from various accounts held by the Institute were personal

and what expenses were legitimate business expenses chargeable to the Institute. The testimony revealed that one major complication faced by the investigators was that defendant had several bank accounts in his name, and Det. Elliott's task was to determine how much of defendant's personal expenses were paid from the Institute's coffers.

Detective Elliott provided extensive testimony about her efforts during the investigation. Her first task was to analyze all of defendant's American Express expenses, dating back to August 2006. Within the five-and-a-half years of credit card statements, roughly 6,500 transactions were reviewed. Detective Elliott testified that her analysis went beyond simply examining records; she went into the field and interviewed persons related to the transactions, and also reviewed reports and recordings of interviews from other detectives. This analysis was "a very big job" that took several months to complete. When asked about topics that she or members of her unit were seeking to understand, Det. Elliott testified that: "We were trying to find out what * * * financial expenditures that were made on behalf of the Institute were legitimate. What transactions were appropriate and what were not. What, specifically, had been authorized by the Board in terms of Mr. Doyle's compensation package, and what hadn't been authorized."

Throughout her lengthy testimony, Det. Elliott provided details about the information and documents that were reviewed, as well as her personal interactions with vendors involved in the numerous transactions. Another complication Det. Elliott encountered was that defendant did not maintain expense reports that separated business expenditures from his personal charges. Detective Elliott provided extensive testimony about how she reached her conclusions about which expenses were personal expenses and which expenditures were business-related, and that,

wherever possible, she adopted a conservative approach, according defendant the benefit of the doubt that an expense was a business expense wherever there was uncertainty.

Ultimately, a summary of Det. Elliott's findings as to which expenses were personal and which were legitimate business expenses under various credit cards and other accounts was admitted into evidence. Detective Elliott gave additional testimony concerning the summary of her findings and the processes used to arrive at her conclusions. Her "very conservative" estimate was that defendant had incurred $145,332.36 in personal expenditures on his personal American Express card which was paid by the Institute.

**Standard of Review**

When the issue is properly preserved, "[t]he decision to permit opinion testimony by a lay witness is within the sound discretion of the trial court. Review of the trial court's decision is limited to determining whether the trial court abused its discretion." *In re Emilee K.*, 153 A.3d 487, 494 (R.I. 2017) (quoting *State v. Mallett*, 600 A.2d 273, 276 (R.I. 1991)).

However, as set out *supra*, "[a]ccording to our well settled 'raise or waive' rule, if an issue was not preserved by *specific* objection at trial, then it may not be considered on appeal." *Pona II*, 66 A.3d at 468 (quoting *McManus*, 990 A.2d at 1237). Again, "[w]e require a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it." *Id.*

**Analysis**

On appeal, defendant argues that the trial justice committed reversible error because Det. Elliott was never qualified as an expert by the state and, as a lay witness, her testimony was inadmissible. The state argues that—were the issue properly preserved—Rule 701 of the Rhode

Island Rules of Evidence does not prohibit lay witness testimony that is based on specialized knowledge or training that is coupled with personal observation.

We note from the outset that the vitality of this issue is encumbered by its own preservation shortcomings. There were inconsistent and unclear objections during Det. Elliott's testimony, and defendant shifted back and forth between arguments under Rule 701 and Rule 702, which presents a significant issue on appeal.[6]

For the purposes of our own analysis, we shall assume that defendant's objections were properly preserved and confine our analysis to Rule 701, the testimony of a lay witness. We are satisfied that the trial justice did not abuse her discretion by allowing Det. Elliott to offer an opinion about the nature of defendant's credit card charges. We are also satisfied that the trial justice did not abuse her discretion in admitting exhibits that were challenged by defendant. Rule 701 provides:

> "If the witness is not testifying as an expert, the witness' testimony in the form of opinions is limited to those opinions which are (A) rationally based on the perception of the witness and (B) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

Clearly, Det. Elliott's opinion was rationally based on the perceptions derived from her extensive review of thousands of defendant's transactions and her follow-up interviews, calls, and e-mail exchanges with parties involved in the transactions. As established at trial, there were thousands of transactions that took place across several states. It would be impossible for Det. Elliott to have witnessed these transactions firsthand when defendant made them, nor was she required to do so, as defendant contends. The testimony established that Det. Elliott carefully

---

[6] The confusion was clarified at oral arguments before this Court, and it was acknowledged by the defense that the issue before this Court is whether evidence was improperly admitted by the trial justice under Rule 701 of the Rhode Island Rules of Evidence, and not Rule 702, which is confined to the testimony of expert witnesses.

reviewed thousands of transactions, and went as far as contacting the vendors in order to understand the nature of the expenditures.

Certainly, Det. Elliott's rationale for concluding that certain credit card charges were personal and not Institute-related was informed by her qualifications and experience, including a bachelor's degree in accounting and years of experience as an accountant in Chicago.[7] Undoubtedly, Det. Elliott's opinions were helpful to a clear understanding of her testimony and the determination of facts at issue. This witness was available and subject to cross-examination. The state was not required to introduce all of the voluminous evidence—upon which Det. Elliott relied—in order for the jury to reach the same conclusion.

We also reject defendant's contention that the trial justice erred in allowing Det. Elliott's testimony because the detective was never qualified as an expert witness. We are of the opinion that Det. Elliott testified about her own firsthand observations and did not offer expert opinion testimony because there was no need for her to do so. Rule 702 governs the use of expert testimony, and states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of fact or opinion."

---

[7] We note that at trial, when asked about how she made determinations as to the nature of the charges she was reviewing, Det. Elliott stated, in part:

> "So as I went through line by line keeping in mind the mission of the Institute and * * * my training and experience in auditing expense reports from Chicago, I kept that in mind and tried to use, you know, as much common sense as I could to what would be a business expense and what would not be."

We also note that, with respect to these qualifications and Det. Elliott's foundation for forming her opinions, defendant never objected to the testimony about Det. Elliott's education and training.

Opinion testimony about the nature of charged expenses on one's American Express card is not the type of scientific, technical, or other specialized knowledge contemplated by Rule 702. *See, e.g.*, *Owens v. Silvia*, 838 A.2d 881, 891 (R.I. 2003) ("When a party seeks to introduce, through expert testimony, *novel scientific* or *complex technical evidence*, it is proper for the trial justice to exercise a gatekeeping function.") (emphasis added). Expert testimony and its admissibility can hinge on the scientific validity of theories and procedures used to arrive at the opinion, for example. *DiPetrillo v. Dow Chemical Company*, 729 A.2d 677, 689 (R.I. 1999) (providing examples of factors such as "whether the theory or technique has been subjected to peer review and publication[,]" and "the known or potential rate of error") (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993)).

The testimony of a forensic accountant is not necessary to prove that drawing two salaries, or paying for a child's college tuition from Institute funds, or making a donation to one's college alma mater amounts to embezzlement. There is nothing scientifically novel or complex about evidence that money for one's personal expense was purloined from the company till. Accordingly, we are satisfied that the trial justice did not abuse her discretion in allowing the testimony of Det. Elliott, and we reject defendant's contentions on these grounds.

## Waiver of Defendant's Attorney-Client Privilege

The defendant's third argument on appeal is that the trial justice committed reversible error when she permitted an improper waiver of the attorney-client privilege, and that the introduction of the evidence violated his rights under the Sixth Amendment to the United States Constitution and article 1, section 10 of the Rhode Island Constitution. The facts relevant to this issue are as follows. On November 20, 2012, defendant executed a release on behalf of the Institute, authorizing a waiver of the *Institute's* attorney-client privilege so that attorney William

J. Lynch could provide relevant documents to the Rhode Island State Police. The defendant was the executive director and executed a waiver of the Institute's attorney-client privilege. The record established that attorney Lynch had, on occasion, provided legal representation to the Institute and had represented defendant in his individual capacity on one occasion, in 2003, when he wrote a letter to the company Amazon regarding a review on its website about one of defendant's published books. Attorney Lynch also testified before the grand jury as to matters related to the Institute, in reliance on the 2012 release. He did not, however, testify as to his limited representation of defendant individually.

On August 3, 2016, the Institute was placed into temporary receivership by a justice of the Superior Court. Attorney Jonathan Savage was appointed temporary receiver. On September 1, 2016, defendant moved to dismiss the indictment, arguing that the "events that occurred prior to and during the Grand Jury proceedings * * * substantially and illegally influenced the Grand Jury's decision to indict" him. The defendant argued that dismissal of the indictment was warranted because attorney Lynch testified before the grand jury, not only about documents that had been disclosed to the grand jury in accordance with the release, but also to a number of matters beyond the scope of the release.[8]

During a pretrial hearing, attorney Lynch testified about the scope of his representation of the Institute and of defendant personally. Based on his testimony and other evidence presented at the hearing, the trial justice concluded that, as between attorney Lynch and defendant, there was "no evidence of the existence of a professional relationship and no evidence that any

---

[8] In his memorandum in support of his motion to dismiss the indictment, defendant complained that attorney Lynch testified "[r]egarding [the Institutes]'s confidential financial information[,]" and that he reminded "the Grand [J]ury that he was not involved in his client's legal matters." The denial of the motion to dismiss the indictment is not before us, and none of the information provided in the memorandum is of moment to the waiver of the Institute's attorney-client privilege.

confidentiality was breached by him." The trial justice denied defendant's motion to dismiss the indictment on these grounds. Undaunted, defendant again sought the exclusion of the evidence later at trial by attempting to withdraw the 2012 waiver on behalf of the Institute.

Trial commenced on September 21, 2016. It was anticipated that attorney Lynch would appear as a witness for the state, along with attorney John J. Partridge, who had assisted in incorporating the Institute in the 1980s. Attorney Savage, in his capacity as receiver, had issued an authorization for attorney Partridge to testify. The defendant provided the state and the Rhode Island State Police with written notice, purporting to withdraw and revoke the November 2012 waiver of attorney-client privilege as it related to attorney Lynch. However, based on her earlier ruling that there was no attorney-client privilege between attorney Lynch and defendant *individually*, and, based on the release provided by attorney Savage for attorney Partridge, the trial justice held that both attorney Lynch and attorney Partridge could testify about matters related to the Institute.

**Standard of Review**

"It is well-established that the findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed absent a showing that the trial justice overlooked or misconceived material evidence or was otherwise clearly wrong." *Haviland v. Simmons*, 45 A.3d 1246, 1255-56 (R.I. 2012) (quoting *Fleet National Bank v. 175 Post Road, LLC*, 851 A.2d 267, 273 (R.I. 2004)). "[R]esolution of mixed questions of law and fact, as well as the inferences and conclusions drawn from the testimony and evidence, are entitled to the same deference." *Hawkins v. Town of Foster*, 708 A.2d 178, 182 (R.I. 1998) (quoting *Wickes Asset Management, Inc. v. Dupuis*, 679 A.2d 314, 317 (R.I. 1996)).

**Analysis**

Before this Court, defendant argues that, as receiver, attorney Savage should not have been permitted to waive the Institute's attorney-client privilege, in order for the state to present the testimony of attorneys Lynch and Partridge. Relying on *SEC v. Ryan*, 747 F. Supp. 2d 355 (N.D.N.Y. 2010), a trial court decision, defendant suggests that the authority to waive the attorney-client privilege by a receiver arises only in circumstances where the receiver has been granted broad and specific authority from the appointing court and that such authority was not conferred in this case. The defendant also contends that the November 2012 waiver of attorney-client privilege for the grand jury did not preclude his reassertion of the privilege at trial.

The state, on the other hand, points to the United States Supreme Court's decision in *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985), which declared that "[b]ecause the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the actor whose duties most closely resemble those of management should control the privilege in bankruptcy[.]" *Weintraub*, 471 U.S. at 351-52. In that case, the Supreme Court held that the trustee in bankruptcy has wide-ranging management authority over the debtor-business, including the power to waive the attorney-client privilege of a bankrupt corporation with respect to pre-bankruptcy communications. *Id.* at 358. Applying the logic of *Weintraub* to the case at bar, the state argues that, once the Institute entered receivership, the receiver, rather than former management, stood in the shoes of management and was empowered to waive the Institute's attorney-client privilege. According to the state, at that point, defendant, the Institute's former director, no longer had the right to do so. Furthermore, the state contends, in *DEPCO v. Mapleroot Development Corporation*, 710 A.2d 167 (R.I. 1998), this Court referred to *Weintraub* as support for its argument that, under Rhode Island law, a receiver should

be permitted to control a defunct corporation's attorney-client privilege. *See DEPCO*, 710 A.2d at 170.

"'[T]o encourage full and frank communications between attorneys and their clients,' we have long recognized that 'communications made by a client to his attorney for the purpose of seeking professional advice, as well as the responses by the attorney to such inquiries, are privileged communications not subject to disclosure.'" *DeCurtis v. Visconti, Boren & Campbell, Ltd.*, 152 A.3d 413, 423 (R.I. 2017) (quoting *Mortgage Guarantee & Title Co. v. Cunha*, 745 A.2d 156, 158-59 (R.I. 2000)). "Genuine attorney-client communications are afforded the highest level of protection by our courts." *Id.* "However, 'the attorney-client privilege protects from disclosure only the *confidential* communications between a client and his or her attorney.'" *Id.* (brackets omitted) (quoting *State v. von Bulow*, 475 A.2d 995, 1004 (R.I. 1984)). "[T]he privilege must be narrowly construed because it limits the full disclosure of the truth." *Id.* (quoting *Callahan v. Nystedt*, 641 A.2d 58, 61 (R.I. 1994)).

Although this Court has not had occasion to rule on the attorney-client privilege of a corporation, it is well settled "that the attorney-client privilege attaches to corporations as well as to individuals." *Weintraub*, 471 U.S. at 348 ("Both for corporations and individuals, the attorney-client privilege serves the function of promoting full and frank communications between attorneys and their clients.") (citing *Upjohn Company v. United States*, 449 U.S. 383 (1981)). In this context, the power to waive the attorney-client privilege "rests with the corporation's management and is normally exercised by its officers and directors. The managers, of course, must exercise the privilege in a manner consistent with their fiduciary duty to act in the best interests of the corporation and not of themselves as individuals." *Id.* at 348-49 (footnote omitted) (citing *Dodge v. Ford Motor Co.*, 170 N.W. 668, 684 (Mich. 1919)).

*Weintraub* also stands for the principle that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Weintraub*, 471 U.S. at 349. In this situation, "[n]ew managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession, may waive the attorney-client privilege with respect to communications made by former officers and directors." *Id.* *Weintraub* also held that: "Displaced managers may not assert the privilege over the wishes of current managers, even as to statements that the former might have made to counsel concerning matters within the scope of their corporate duties." *Id.*

This Court looked to the logic of *Weintraub* in *DEPCO*, cited *supra*.[9] Although *DEPCO* was factually distinguishable from *Weintraub*, we applied its reasoning in that case. We do so again today.

---

[9] In *DEPCO v. Mapleroot Development Corporation*, 710 A.2d 167 (R.I. 1998), the Rhode Island Depositors Economic Protection Corporation (DEPCO) had acquired a loan from the receiver of the then-defunct Marquette Credit Union when DEPCO acquired substantially all of the assets of Marquette. *DEPCO*, 710 A.2d at 168. The loan at issue had been made from Marquette to the original borrower, Mapleroot Development Corporation. *Id.* Mapleroot and its shareholders were the respondents in the case, as they had been sued by DEPCO, which was seeking repayment of the loan it had acquired. *Id.* During the litigation, Mapleroot sought production of documents that related to the communications between (1) Marquette and its legal counsel and (2) Marquette's receiver and the receiver's legal counsel relative to the loan and its collection. *Id.* The Superior Court compelled DEPCO to produce the requested attorney-client documents to Mapleroot, and DEPCO petitioned this Court to quash the discovery order. *Id.*

On appeal, Mapleroot claimed that DEPCO lacked standing to assert an attorney-client privilege that belonged to Marquette or its receiver, and that DEPCO had no authority to acquire such a privilege when it purchased substantially all of Marquette's assets, including the loan at issue. *DEPCO*, 710 A.2d at 168. We held that DEPCO was authorized to assert the attorney-client privilege because if DEPCO had acquired the same loans as a conservator or a receiver—as it was authorized to do by statute—DEPCO would have also been entitled to assert the attorney-client privilege with respect to any documents it received when Marquette transferred its loan portfolio, based on *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985). *Id.* at 170.

At the time of trial, defendant simply had no authority to assert the attorney-client privilege on behalf of the Institute. By that point in time, he had been divested of any authority to manage or to conduct the affairs of the corporation. This is so because he had been ousted when a receiver was appointed. The record is abundantly clear that these witnesses were expected to testify to matters that pertained to the Institute as a corporate client, and not about defendant personally. What is equally apparent is that defendant was not seeking to protect the Institute, but rather to insulate himself from the proof of his perfidy. When defendant executed the November 2012 release authorizing the waiver of the Institute's attorney-client privilege, he had the authority to do so as its executive director. *See Weintraub*, 471 U.S. at 348 ("[F]or solvent corporations, the power to waive the corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors."). However, after the Institute was placed into receivership, defendant had no authority to act on its behalf, including asserting an attorney-client privilege, even as to his own communications with attorneys Lynch or Partridge that related to the Institute. *See id.* at 349 ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well. New managers installed * * * may waive the attorney-client privilege with respect to communications made by former officers and directors."). Echoing *Weintraub*'s reasoning, we are of the opinion that, once attorney Savage was appointed as receiver, the issue of waiver of the attorney-client privilege rested with him.

The trial justice was not clearly wrong in allowing the testimony of attorneys Lynch and Partridge. We reject defendant's contentions concerning this issue.

**Presentation of False Evidence**

The defendant's fourth argument on appeal is that the state knowingly or recklessly presented false evidence from one of its witnesses, Robert Zagrodny. At the time of trial, Zagrodny had been a certified public accountant for thirty-five years, and his work included tax and accounting matters as well as financial audits. Mr. Zagrodny testified that defendant first reached out to him some time around 2006, on referral from attorney Lynch, to perform accounting services for the Institute. He was retained in 2008 as an independent accountant, to perform the Institute's 2007 year-end accounting report. He resigned in 2011.

Mr. Zagrodny testified that, although he did not observe any explicit financial fraud, there were several matters of concern, such as the Institute's high debt level and low cash balances, as well as poor bookkeeping. The witness detailed the Institute's bookkeeping shortcomings and how those shortcomings hindered his efforts to conduct meaningful reviews. For example, Zagrodny testified that he was retained to conduct audits of the Institute in 2009, but that the audit simply could not be completed because he was unable to obtain the necessary documentation from defendant and the Institute. Mr. Zagrodny testified on direct-examination that the proliferation of these issues led to his eventual resignation because he was uncomfortable with the representations made by defendant.[10]

---

[10] In his papers, defendant contends that:

> "During the trial, an accountant, Robert Zagrodny, testified that he stopped working for Doyle after he concluded that Doyle forged the name of a donor onto a letter. The false evidence occurred during the redirect examination of Zagrodny who testified he concluded that Doyle had forged the signature of a donor named Howard Falk. His conclusion was incorrect."

The defendant's efforts to impeach Zagrodny on cross-examination drew out even more details about his resignation, and the events leading up to it. The defendant introduced Exhibit PPP into evidence, which was an audit-related pledge document set forth on the Institute's letterhead. Generally, these pledge documents would be sent by Zagrodny's office to potential donors who would return the form verifying the amount of their planned donation, memorialized with their signature. Exhibit PPP was a pledge form from a donor that was to be allocated as a receivable. Although the form contained a signature, Zagrodny testified on cross-examination that he believed the signature to be false—without actual knowledge of its falsity. According to Zagrodny, the Institute's in-house accountant, Paul Kelley, expressed his belief that the pledge was false, and the donor had failed to honor the pledge for at least two years, further drawing the authenticity of the document into question. Finally, defendant refused to allow Zagrodny to contact the donor about his failure to honor the pledge.[11] Significantly, Zagrodny's testimony established that in light of these concerns about defendant and the Institute—which he referred to as "red flags"—it was his *belief* that the signature was not genuine. It was these red flags that prompted his resignation. The evidence disclosed that the signature was in fact that of the donor, but Zagrodny did not learn of that fact; he testified that he knew that the donor had been contacted by the Rhode Island State Police during the grand jury investigation. On redirect-examination, the state questioned Zagrodny about the "red-flags" he referenced during defendant's cross-examination. There was no objection to the admission of this testimony.

The defendant's argument, however, is incorrect. As discussed in greater detail *infra*, it was Zagrodny's *belief* that the signature was forged, among a multitude of other concerns he already had, that prompted his resignation from the Institute.

[11] Mr. Zagrodny's testimony established that defendant's practice of prohibiting anyone other than defendant from reaching out to donors was not confined to this donor. Mr. Zagrodny testified that he and others were prohibited by defendant from reaching out to potential donors beyond sending the initial pledge form.

**Standard of Review**

"Our standard of review of a trial justice's admission of evidence is for an abuse of discretion." *State v. Reyes*, 984 A.2d 606, 614-15 (R.I. 2009). However, we reiterate that, "[a]ccording to our well settled 'raise or waive' rule, if an issue was not preserved by *specific* objection at trial, then it may not be considered on appeal." *Pona II*, 66 A.3d at 468 (quoting *McManus*, 990 A.2d at 1237). "We require a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it." *Id.*

**Analysis**

It is defendant's contention that the state presented false evidence when, on redirect-examination, the state asked Zagrodny why he questioned the donor's signature on the pledge document, a matter that defendant had examined the witness about at length. Although this testimony was admitted without objection, defendant argues that, procedurally, his request for a mistrial was properly made and preserved for appellate review, and that the trial court erred when it failed to rule on his motion for a mistrial related to this issue.

The state responds that this issue was not preserved for appellate review. The state also argues that it was defense counsel who brought to light that Zagrodny was not aware of the results of the state police investigation into the signature and that, once the door to this inquiry was opened, the state was entitled to inquire about additional "red flags" regarding the signature that made Zagrodny leery of performing further work for the Institute. The state argues that there was no contemporaneous objection to this questioning, nor was there a request for a mistrial. The record supports this assertion.

Again, our careful review of the record establishes that this issue is not properly before the Court. This Court's raise-or-waive rule once again controls; "if an issue was not preserved

- 31 -

by *specific* objection at trial, then it may not be considered on appeal." *Pona II*, 66 A.3d at 468 (quoting *McManus*, 990 A.2d at 1237).

The record discloses that, after the witness's testimony was concluded, defendant made a vague supposition that the questioning could warrant a mistrial, but he never asked to pass the case. "Our long-standing rule is that a *contemporaneous* objection or at least a motion to strike * * * are prerequisites to an appellate review." *Ciresi*, 45 A.3d at 1212 (quoting *State v. Garcia*, 743 A.2d 1038, 1048-49 n.7 (R.I. 2000)).[12]

We reject defendant's contention that his request for a mistrial was properly made and preserved. The preservation issue here arises because it is not clear—whether from defendant's papers or our own review of the record—that defendant ever in fact asked the trial justice to grant a mistrial. What is clear is that, at the conclusion of Zagrodny's testimony, defendant raised a different issue to the trial justice related to the prosecutor's "Wow" remark (a separate appellate issue discussed *infra*) that occurred during the previous trial day and that did not relate to Zagrodny. The trial transcripts indicate that defendant suggested that the "Wow" remark, *taken with* the presentation of allegedly false evidence during Zagrodny's testimony, *could* warrant a mistrial.

However, because defendant never objected to Zagrodny's testimony or specifically moved for a mistrial, the trial justice had no opportunity to rule on an issue that defendant now argues constituted reversible error. The closest defendant came to moving for a mistrial was when he pondered aloud to the trial justice: "And I believe those two issues *combined should*, *should* give the Court *concern* as to whether or not a mistrial *should* be declared on this

---

[12] The defendant objected twice during Zagrodny's redirect-examination on the basis of a leading question and on the basis of a legal conclusion. Both objections were sustained, and neither related to the issue of the presentation of false evidence.

particular case, Your Honor." (Emphasis added.) Beyond a mere statement of belief that the court "should be concerned" about two discrete issues, there was no mistrial motion for the trial justice to pass upon.

A mistrial in a criminal trial is an extreme remedy and should be granted only when there is a fundamental defect in the proceeding that cannot be cured, such that the defendant will be deprived of a fair trial. A trial justice may declare a mistrial only in circumstances the law recognizes as manifest necessity. A classic example of manifest necessity is a deadlocked jury. *Renico v. Lett*, 559 U.S. 766, 774-75 (2010) (citing *Arizona v. Washington*, 434 U.S. 497, 509, 510 (1978)). Notwithstanding, a criminal defendant has a valued right to have his or her trial come to a conclusion by the tribunal before whom he or she appears. *United States v. Jorn*, 400 U.S. 470, 484 (1971) (citing *Wade v. Hunter*, 336 U.S. 684, 689 (1949)). Because the accused has been placed in jeopardy, defendant has a "significant interest in the decision whether or not to take the case from the jury" in the event that circumstances arise which necessitate a mistrial. *Id.* at 485.

A motion by the defendant to pass the case seeks the immediate termination of the proceeding and is serious business. It does not serve as an ace in the hole for appellate review. The grounds for the motion should be clearly articulated and the state is entitled to an opportunity to respond. This is critically important in the event the motion is granted and the defendant seeks the remedy of dismissal. *State v. McIntyre*, 671 A.2d 806, 807 (R.I. 1996) (mistrial request by the defendant does not bar retrial except where prosecution goads the defendant into motion to pass) (citing *Oregon v. Kennedy*, 456 U.S. 667 (1982); *State v. Diaz*, 521 A.2d 129 (R.I. 1987)). When confronted with a motion for a mistrial, the trial justice is charged with evaluating the basis for the motion, in order to determine whether a juror voir dire

- 33 -

is warranted and, in the exercise of discretion, decide whether the potential prejudice can be cured by an immediate cautionary instruction. *State v. Footman*, 196 A.3d 758, 765 (R.I. 2018). "A mistrial is appropriate only when a timely cautionary instruction cannot cure the prejudice." *Id.*

None of these crucial considerations occurred with respect to Zagrodny's testimony. Thus, the trial justice did not fail to rule on a motion for a mistrial, as defendant argues, because defendant never moved to pass the case and, significantly, the state was never called upon nor given an opportunity to respond. The defendant has waived this issue for appeal.

### Motion to Suppress Illegally Obtained Evidence

The defendant's fifth argument on appeal is that the trial justice erred when she denied his pretrial motion to suppress evidence which, he claims, was illegally obtained by the state. The facts giving rise to this issue, as presented at a pretrial hearing, were derived from the testimony of two witnesses from the state police: Gerard Ratigan, an investigator in the Financial Crimes Unit at the time, and Lieutenant Robert Creamer, the lead investigator on this case.

As the investigation unfolded, Ratigan and Lt. Creamer spoke with former and current employees of the Institute. One employee and two former employees provided the evidence at issue. Laurie DeRuosi, a former employee, was interviewed by Ratigan and Lt. Creamer at her home. The investigators testified that they were unaware that DeRuosi was in possession of any documents from the Institute and that they had no expectation that she would provide them with Institute materials. Rather, in the course of their conversation, DeRuosi voluntarily produced a thumbdrive containing data she collected during her employ at the Institute. Ms. DeRuosi gave the thumbdrive to the state police without being asked to do so.

The second former employee, Lorna Prout, was interviewed at her home, and a similar situation arose. Lieutenant Creamer testified that, at the time of his interview at Prout's home, he had no knowledge of the evidence or the materials that he eventually received. In the course of the investigators' conversation with Prout, she provided them with a shoebox containing paperwork and microcassettes that she had saved from her time with the Institute. The investigators did not direct Prout to retrieve the material, and she voluntarily provided it.

Finally, Ratigan and Lt. Creamer testified that they served a grand jury subpoena *duces tecum* on Lee Anne McCullough, who, at that time, was an employee of the Institute, seeking Institute-related documents for the grand jury. In response to the subpoena, McCullough produced Institute work product that she had stored on her home computer.[13] According to Ratigan, it was McCullough who selected the documents from the computer and transferred them onto a thumbdrive. No documents covered by the attorney-client privilege were included.

After considering the evidence and testimony submitted, the trial justice found no prosecutorial misconduct in the case. As for the subpoena issued to McCullough, the trial justice stated that "the subpoena authority of the Grand Jury was not contorted or misused or abused in any way." With respect to the materials produced by DeRuosi and Prout, the trial justice found that they were private individuals who voluntarily provided the materials in their possession. The trial justice held that there were no Fourth Amendment implications related to these witnesses and, thus, no warrant was required. The trial justice concluded that the procedures employed by Ratigan and Lt. Creamer were proper. Therefore, the trial justice denied defendant's motion to suppress the evidence.

---

[13] When the subpoena was issued, the state police wanted to seize McCullough's personal computer, but she was allowed to download the information to a thumbdrive because non-Institute-related material also was stored on that device.

**Standard of Review**

When reviewing a trial justice's decision granting or denying a motion to suppress evidence, "we defer to the factual findings of the trial justice, applying a clearly erroneous standard." *State v. Barkmeyer*, 949 A.2d 984, 995 (R.I. 2008) (quoting *State v. Apalakis*, 797 A.2d 440, 443 (R.I. 2002)). We conduct a *de novo* review, however, of "a trial justice's determination of the existence or nonexistence of probable cause or reasonable suspicion." *State v. Foster*, 842 A.2d 1047, 1050 (R.I. 2004) (quoting *State v. Keohane*, 814 A.2d 327, 329-30 (R.I. 2003)).

"With respect to questions of law and mixed questions of law and fact involving constitutional issues, however, this Court engages in a *de novo* review in accordance with *Ornelas v. United States*, 517 U.S. 690 (1996)." *Apalakis*, 797 A.2d at 443. "When called upon to review a trial justice's denial of a motion to suppress on Fourth Amendment grounds, our task is to review the record to determine, based on the totality of the circumstances, whether the evidence sought to be suppressed was obtained in violation of the constitutional prohibition against warrantless searches and seizures." *Barkmeyer*, 949 A.2d at 995 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

**Analysis**

On appeal, defendant argues that the subpoena issued by the grand jury and the interviews with former Institute employees at their homes—and the information obtained from them—constituted state action and warrantless searches that implicated the Fourth Amendment to the United States Constitution and article 1, section 6 of the Rhode Island Constitution. The defendant contends that, based on the United States Supreme Court's decision in *Wong Sun v. United States*, 371 U.S. 471 (1963), the trial court should have ordered the suppression of this

evidence because, he argues, it was seized illegally, and all evidence derived from it was "the fruit of the poisonous tree." The state contends that the trial justice correctly concluded that, in light of the absence of state action, the Fourth Amendment was not implicated in this case, either when the state received the materials voluntarily from the witnesses or pursuant to a grand jury subpoena. We agree.

"The Fourth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides: 'The right of the people to be secure in their persons * * * against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause * * *.'" *State v. Flores*, 996 A.2d 156, 160 (R.I. 2010) (quoting U.S. Const. Amend. IV); *see State v. Foster*, 842 A.2d at 1050 n.3 (declaring that article 1, section 6 of the Rhode Island Constitution is "substantively the same" as the Fourth Amendment to the United States Constitution). Searches conducted by private citizens do not implicate the protections of the Fourth Amendment. *See Barkmeyer*, 949 A.2d at 996; *see also State v. Pailon*, 590 A.2d 858, 861 (R.I. 1991) ("Because the exclusionary rule in respect to Fourth Amendment violations is based upon the deterrence of illegal police or prosecutorial actions, it is not triggered by the actions of private persons however egregious they may be."). "However, when deciding whether to admit the fruits of a private search, it is incumbent upon the trial court to determine whether the law enforcement agency's involvement 'was not a significant expansion of the prior private search.'" *Barkmeyer*, 949 A.2d at 995 (quoting *von Bulow*, 475 A.2d at 1015).

In the case at bar, the Fourth Amendment is not implicated as to the material provided to the state police by DeRuosi and Prout, because the materials were obtained by DeRousi and Prout in their capacity as private citizens with no connection to law enforcement. The trial

justice did not err in finding that there was no state action implicated in the production of this evidence. Also, there was no significant expansion of a private search by the law enforcement agency in this case. As established at trial, Ratigan and Lt. Creamer were unaware before arriving at their homes that these former employees possessed the Institute's materials, and the materials were turned over to them voluntarily, without any direction from the state police.[14] Finally, there has been no showing that this material belonged to defendant. We are satisfied that the trial justice did not clearly err in any of her findings of fact in arriving at her decision to deny the motion to suppress, and our *de novo* review of the record satisfies us that the evidence sought to be suppressed was not obtained in violation of the constitutional prohibition against warrantless searches and seizures.

As to the material obtained from McCullough, defendant's contention that standing alone, a grand jury subpoena for the production of documents implicates the Fourth Amendment is simply wrong. Although a grand jury subpoena is not purely private action, grand juries are also "less cabined by Fourth Amendment restrictions[.]" *State v. Guido*, 698 A.2d 729, 733 (R.I. 1997) (citing *United States v. Mara*, 410 U.S. 19 (1973); *United States v. Dionisio*, 410 U.S. 1 (1973)). In *Guido*, we held that a defendant had no legitimate Fourth Amendment expectation of privacy in Rhode Island Hospital's medical records relating to his emergency treatment following a near-fatal automobile collision. *Id.* In arriving at our decision, we noted that, while the Fourth Amendment protects against state intrusions into *legitimate* expectations of privacy, the expectation must be one *actually held* by the defendant and one that society at large would recognize as reasonable. *Id.* We noted the well-established principle that "[w]hen no reasonable privacy interest has been unlawfully invaded, the introduction of evidence seized is not

---

[14] The clear implication in this case is that the former employees were holding onto the materials to protect themselves as whistleblowers in the event of an investigation.

prevented." *Id.* at 734 (quoting *State v. Timms*, 505 A.2d 1132, 1137 (R.I. 1986)). In *Guido*, we held that the defendant had no legitimate expectation of privacy in the medical records at issue because the records were prepared by medical personnel for their use, to provide medical treatment to the defendant, and were not the defendant's personal papers created or kept by him. *Id.* We also noted that the defendant was unable to demonstrate either ownership or possession over the documents. *Id.*

Similarly, in the case at bar, defendant had no legitimate expectation of privacy in the documents that society at large would recognize as reasonable. The documents produced were obtained by McCullough through her work as secretary of the Institute, and were not personal papers kept or created by defendant. In fact, it was established at trial that McCullough selected the files herself and did not turn over any privileged attorney-client material. Because defendant did not have a legitimate expectation of privacy in the materials subpoenaed, the Fourth Amendment was not implicated in this case.

Therefore, we are satisfied that the subpoena of records from McCullough was properly issued and executed, and was not done in contravention of the warrant requirement. We are also of the opinion that the documents obtained from DeRuosi, Prout, and McCullough were voluntarily produced.

### The Prosecutor's "Wow" Remark

The defendant's sixth argument on appeal is that the trial justice committed reversible error when she failed to declare a mistrial after defendant declined to cross-examine a witness and the prosecutor remarked, "Wow." When the state concluded its direct examination of Deborah Burch, the trial justice invited defendant to conduct cross-examination, and the following exchange took place:

"THE COURT: [Defense counsel], whenever you're ready, sir.

"[DEFENSE COUNSEL]: Your Honor, I'm all set. No questions of this witness. We have other witnesses going to address the testimony of Ms. Burch --

"THE COURT: Very well.

"[DEFENSE COUNSEL]: -- at a later time.

"[PROSECUTOR]: Wow.

"THE COURT: Ms. Burch, you are released. Thank you for making the trip."

The defendant did not raise a contemporaneous objection, and it is unclear whether the defense team overheard the prosecutor's comment, although the trial justice made clear later that she did not hear it. In fact, it was not until after the next witness, Robert Zagrodny, testified on the next trial day—one week later—that defendant raised this issue. After Mr. Zagrodny's testimony concluded, defense counsel brought up the "Wow" remark to the trial justice and indicated that it was defendant, and not defense counsel, who heard the comment and, according to counsel, defendant informed him "that at least several of the jurors visibly responded to that particular comment. And we have great concern that, it, it has, will affect, potentially affect whatever verdict they reach." Defense counsel pointed to the close proximity between defendant, the state, and the jurors in the courtroom, and "the concern that [the jurors] appear to be listening in to conversations between counsel, and what effect, if at all, it may have on a jury." Defense counsel then stated: "The comment, after choosing not to question the witness, Your Honor, I think is one that merits *serious concern* and *consideration* as to whether or not it's grounds for a mistrial." (Emphasis added.)

The trial justice asked counsel if he wanted the court to inquire of the jurors to learn if anyone had heard the comment. Defense counsel responded, "I don't know, I don't know how to

- 40 -

deal with that," and offered nothing further. The trial justice next gave defense counsel the option of an immediate limiting instruction, but the offer was rejected over concerns about drawing further attention to the remark. Instead, defendant asked for an instruction to be included in the final charge to the jury. No motion to pass the case was made. The state did not offer any comment or response, and trial proceeded.

When the final jury instructions were given, no limiting instruction on this specific issue was included. Although defendant was given the opportunity to object to the proposed instructions, he declined to do so.

## Standard of Review

"A trial justice's decision to deny a motion for mistrial is accorded great weight and will not be disturbed on appeal unless it is clearly wrong." *State v. Enos*, 21 A.3d 326, 332 (R.I. 2011) (quoting *State v. Higham*, 865 A.2d 1040, 1044 (R.I. 2004)). However, again, "[a]ccording to our well settled 'raise or waive' rule, if an issue was not preserved by *specific* objection at trial, then it may not be considered on appeal." *Pona II*, 66 A.3d at 468 (quoting *McManus*, 990 A.2d at 1237). "We require a specific objection so that the allegation of error can be brought to the attention of the trial justice, who will then have an opportunity to rule on it." *Id.*

## Analysis

On appeal, defendant argues that the prosecutor's comment violated defendant's constitutional right to decline cross-examination of a witness, and he also contends that the remark "essentially vouched for" the witness by implying, through his remark, that her testimony was powerful and harmful to the defense, thus necessitating a cross-examination. The defendant contends that the objection he made on the *next* trial date, rather than when the comment was made, was procedurally adequate. The defendant also argues that despite his request for a

curative instruction, the trial justice ultimately failed to give one.

On the other hand, the state argues that no contemporaneous objection to the comment was made. The state suggests that it was not until the next trial date, a week later, that defense counsel "pondered out loud during a colloquy with the court whether the incident, when coupled with the defense's concern about Zagrodny's redirect examination * * * *justified* a mistrial," but that defendant never actually moved for a mistrial. (Emphasis added.) Moreover, the state contends that defendant never requested that the jury be polled or that the trial justice inquire of individual jurors about what impact, if any, the prosecutor's remark may have had. Rather, defendant asked that a cautionary instruction be deferred to the end of trial, then failed to submit a proposed instruction or object to the omission. As such, the state argues, this issue was waived for appeal.

The resolution of this issue is controlled by this Court's well-settled "raise-or-waive" rule, as defendant did not properly preserve his contentions for appellate review. The defendant did not contemporaneously and specifically object to the "Wow" remark. The defendant had ample opportunity to bring the issue to the trial justice's attention before the next trial date, and defendant failed to do so. Furthermore, the state was not afforded an opportunity to respond, or to explain what happened.

When the issue was finally brought to the attention of the trial justice, defendant did so in a manner which can only be characterized as vague and uncertain. The defendant's counsel simply pondered aloud whether a mistrial could be warranted, rather than making a specific motion to pass the case. *See* Super. R. Crim. P. 47 ("The motion shall state with particularity the grounds upon which it is made and shall set forth the relief or order sought."). The defendant rejected the offer of an immediate cautionary instruction—which could have remedied any

potential prejudice—and settled on a limiting instruction at the end of trial. The defendant again failed to preserve the issue for appellate review. *See State v. Brezinski*, 731 A.2d 711, 714-15 (R.I. 1999) (holding that the defendant had waived the issue of whether the trial justice erred by refusing to instruct the jury on a lesser-included offense where counsel for the defendant failed to make a timely and specific objection—in accordance with Rule 30 of the Superior Court Rules of Criminal Procedure—when the trial justice did not give a lesser-included instruction to the jury); *see also* Super. R. Crim. P. 30 ("At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the request. * * * *No party may assign as error any portion of the charge or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the party's objection*.") (emphasis added). This issue was not properly preserved for appellate review, and we refuse to overturn defendant's conviction on these grounds.

## Motion for a New Trial Based on the Weight of the Evidence

The defendant's seventh argument on appeal is that his convictions for embezzlement contravene the weight of the trial evidence. On December 14, 2016, defendant filed a motion for a new trial pursuant to Rule 33 of the Superior Court Rules of Criminal Procedure. A memorandum of law in support of the motion, spanning over forty pages, subsequently was filed; it advanced over a dozen arguments. None of the arguments set forth in the motion raised the issue of the elements essential to establish the crime of embezzlement. A hearing on the motion was held on March 6, 2017. The defendant's motion for a new trial was denied in a written decision issued on April 11, 2017. This issue is not appropriately before the Court.

**Standard of Review**

Review of a trial justice's decision on a motion for a new trial based on the weight of the evidence is normally deferential, and the decision will be given great weight and not be disturbed "unless the trial justice overlooked or misconceived material evidence or otherwise was clearly wrong." *State v. Lopez*, 129 A.3d 77, 83-84 (R.I. 2016) (quoting *State v. Garrett*, 91 A.3d 793, 800 (R.I. 2014)). However, again, the raise-or-waive rule is a fundamental rule in this state that is "staunchly adhered to" by this Court. *Cusick*, 210 A.3d at 1203 (quoting *Rohena*, 154 A.3d at 938). "It is well settled that a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *State v. Bido*, 941 A.2d 822, 828-29 (R.I. 2008).

**Analysis**

On appeal, defendant advances a novel legal theory that the crime of embezzlement mandates proof of an element of secrecy. Relying on this Court's decisions in *State v. Ricci*, 533 A.2d 844 (R.I. 1987), and *State v. Davis*, 37 R.I. 373, 92 A. 821 (1915), defendant contends that, because he reported the allegedly embezzled monies on his personal income tax returns, as well as the tax returns from the Institute and its audited financial statements, this lack of secrecy renders the embezzlement convictions void as a matter of law. The state argues that defendant never raised this issue before the lower court and that, therefore, it is waived. The state also argues that, on the merits, defendant's contention about an element of "secrecy" in an embezzlement prosecution is an incorrect interpretation of relevant statutes and caselaw.

This issue is also easily resolved under this Court's well-settled "raise-or-waive" rule, as defendant did not properly preserve the issue for appeal. This Court has previously held that, where a defendant argues that a trial justice erred in denying his or her motion for a new trial but relies on issues raised for the first time on appeal, appellate review is waived. *See State v.*

- 44 -

*Bergevine*, 942 A.2d 974, 980-82 (R.I. 2008) (affirming trial justice's denial of a defendant's motion for a new trial where defendant, on appeal, contended that the trial justice failed to acknowledge several "deficits" in one witness's testimony, but had failed to alert the trial justice). In the case at bar, defendant never brought his assertion that the crime of embezzlement requires proof of an element of "secrecy" to the attention of the trial justice. The defendant's appellate argument on this issue has therefore been waived.

### Motion for a New Trial Based on the Sufficiency of the Evidence

The defendant's final argument on appeal is also based on the denial of his motion for a new trial and is, simply put, another unique approach to our law. Broadly, defendant argues that the trial justice erred in denying his motion for a new trial because the evidence was insufficient to support his conviction under count eight of the indictment, obtaining money under false pretenses.[15]

### Standard of Review

When reviewing the decision of a trial justice on a motion for a new trial challenging the sufficiency of the evidence, "[t]his Court reviews the trial justice's decision *de novo*; we examine the evidence in the light most favorable to the verdict which has been returned by the jury." *State v. Clark*, 974 A.2d 558, 571 (R.I. 2009) (citing *United States v. Paret-Ruiz*, 567 F.3d 1, 5 (1st

---

[15] Count eight of the indictment reads:

> "That [defendant] * * * on or about diverse days and dates from May 21, 2007 through December 31, 2010, in the State of Rhode Island, did obtain money, being of a value of over Fifteen Hundred Dollars ($1500.00), to wit, The Hassenfeld Foundation donation to the [Institute] designated for use on the construction of the Hassenfeld-Hogg Center for Sports Leadership Building, from Alan Hassenfeld and/or The Hassenfeld Foundation, * * * *in violation of § 11-41-4 and § 11-41-5* of the General Laws of Rhode Island, 1956, as amended (Reenactment of 2002)." (Emphasis added.)

Cir. 2009)). "We will not overturn a guilty verdict unless, viewing the evidence in the light most favorable to the prosecution, no reasonable jury could have rendered it." *Id.* (brackets omitted) (quoting *Paret-Ruiz*, 567 F.3d at 5).

**Analysis**

On appeal, defendant argues that, because he used some, but not all, of the money the Institute obtained from Hassenfeld for construction of the Leadership Building and for "other bills and projects relating to [the Institute,]" the evidence was insufficient to support his convictions for larceny by embezzlement and obtaining money under false pretenses. The defendant's logic appears to be that because *some* funds directed to the Institute were expended correctly, and not all of the money was purloined to support his lifestyle, the evidence was insufficient to support his convictions. The state responds that this issue was also not properly preserved and that, even if it were, defendant's argument fails on the merits.

When a new trial motion challenges the sufficiency of the evidence, "it is incumbent upon the trial justice to review the evidence and decide whether, as a matter of law, the evidence legally is sufficient to support a verdict of guilty beyond a reasonable doubt." *Clark*, 974 A.2d at 570. "The trial justice must examine the evidence in the light most favorable to the prosecution, without assessing the weight of the evidence or the credibility of the witnesses, and draw all reasonable inferences consistent with guilt, mindful that the jury likewise has done so." *Id.* (citing *United States v. Jones*, 418 F.3d 726, 729 (7th Cir. 2005)). "[I]f the trial justice concludes that, based on the evidence, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" then the trial justice must deny the defendant's motion for a new trial. *Id.* at 571 (quoting *Jones*, 418 F.3d at 729).

We note from the outset that review of this issue is complicated by defendant's arguments. The first two sentences in his appellate brief relating to this issue appear to be focused on the trial justice's decision to deny his motion for a new trial with respect to his guilty verdict under count eight of the indictment.[16] However, in advancing his argument, defendant relies on § 11-41-3, entitled "Embezzlement and fraudulent conversion[,]" a charge that was not made under that count of the indictment. Further, this issue was not raised in defendant's memorandum in support of his motion for a new trial, but our review of the record indicates that defendant raised the argument at the hearing.

Assuming that the issue was properly preserved and effectively advanced on appeal, we are satisfied that the evidence was sufficient to support defendant's guilty verdict under count eight and that the trial justice properly denied defendant's motion for a new trial. We assume, if only for the sake of discussion, that defendant intended to challenge the sufficiency of the evidence under § 11-41-4, as charged in the indictment.[17]

Section 11-41-4 provides that: "Every person who shall obtain from another designedly, by any false pretense or pretenses, any money, goods, wares, or other property, with intent to cheat or defraud * * * shall be deemed guilty of larceny." "The essential elements of obtaining

---

[16] The first two sentences of defendant's brief on this issue reads:

> "The grand jury indicted [defendant] for allegedly purloining from Mr. Hassenfeld $550,000 that he had earmarked for the construction of a second building and indicted him for converting the property entrusted to him as an officer of the Institute. Trial testimony, however, unequivocally indicated that Mr. Doyle used some portion of the allotted money on other bills and projects relating to [the Institute]."

We note that the indictment charged defendant with obtaining more than $1,500.

[17] Although it was charged in the indictment, we omit discussion of § 11-41-5, as that statute merely covers the penalties for a violation of various statutes, including § 11-41-4.

property by false pretenses are that the accused (1) obtain property from another designedly, by any false pretense or pretenses; and (2) with the intent to cheat or defraud." *State v. Letts*, 986 A.2d 1006, 1011 (R.I. 2010) (brackets omitted) (quoting *State v. Markarian*, 551 A.2d 1178, 1180 (R.I. 1988)). "A promise to perform a future act" may constitute a false pretense. *Id.* ("[T]he rule in this state is that a misrepresentation with regard to a *future transaction*, no less than one relating to an *existing fact*, is a false pretense within the meaning of § 11-41-4.") (quoting *State v. Aurgemma*, 116 R.I. 425, 431, 358 A.2d 46, 50 (1976)). At trial, the jury heard lengthy testimony, and received ample evidence, establishing that Alan Hassenfeld's generous donation of almost $550,000 through the Hassenfeld Foundation was to be applied to the construction of the Leadership Building. The evidence included, but was not limited to, a January 2007 letter from defendant to Mr. Hassenfeld, which read, in part: "Dear Alan: We are honored that you are willing to lend your great name to what is one of the most important initiatives in the history of the Institute for International Sport—the construction of the Center for Sports Leadership Building on the URI campus." The evidence also disclosed that funding for the construction of the ill-fated Leadership Building had already been secured by the JCLS grant.

In viewing the evidence in the light most favorable to the state, we are satisfied that this evidence was sufficient for a jury reasonably to conclude that defendant's promise to build the Leadership Building—the construction of which was never completed—constituted a false pretense, through which defendant obtained almost $550,000 from Hassenfeld.

In accordance with § 11-41-4, "[t]he crime is complete when the defendant intentionally uses false pretenses to induce another to alter or terminate any of that person's rights or powers concerning the money or property with the intent to cheat or defraud that person." *Letts*, 986

A.2d at 1011 (quoting *State v. Fiorenzano*, 690 A.2d 857, 859 (R.I. 1997)). "This Court has defined an intent to defraud as 'an intention to deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter or terminate that other person's * * * right, obligation or power with reference to property.'" *Id.* at 1011-12 (brackets omitted) (quoting *Fiorenzano*, 690 A.2d at 859). "Such intent can be inferred, and the only relevant time period is when the victim is 'induced to part with his money or property.'" *Id.* at 1012 (quoting *Fiorenzano*, 690 A.2d at 860).

In the case at bar, the jury received evidence and heard testimony establishing that the defendant's crime was complete when the Hassenfeld Foundation made its gift to the defendant, under the false pretense that the gift would be used to construct the Leadership Building. At trial, it was established that seven different transactions were made from the Hassenfeld Foundation to the Institute into various Institute accounts, ranging in amounts from tens of thousands of dollars up to hundreds of thousands of dollars. A substantial amount of these funds was diverted for the defendant's own personal benefit. In viewing the evidence in the light most favorable to the state, as we are required to do, we are of the opinion that this evidence was more than sufficient for the jury reasonably to conclude that the defendant intended to cheat and defraud the Hassenfeld Foundation, among his other victims. We are satisfied that the trial justice did not err in denying the defendant's motion for a new trial on these grounds.

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of conviction. The record shall be remanded to the Superior Court.

Justice Indeglia participated in the decision but retired before its publication.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE
Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Daniel E. Doyle, Jr. |
| **Case Number** | No. 2017-312-C.A.<br>(W1/13-193A) |
| **Date Opinion Filed** | July 8, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Washington County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Melanie Wilk Thunberg |
| **Attorney(s) on Appeal** | For State:<br><br>Lauren S. Zurier<br>Christopher R. Bush<br>Department of Attorney General |
| | For Defendant:<br><br>Gary G. Pelletier, Esq.<br>David A. Levy, Esq. |